IN THE CIRCUIT COURT OF THE 7TH JUDICIAL CIRCUIT IN AND FOR ST. JOHNS COUNTY, FLORIDA

CASE NO.:   CA21-1014

JEFFREY G. MEYER and
ANNE G. MEYER,

      Plaintiffs,

v.

BANK OF AMERICA, N.A.,

      Defendant.

_____/

## **COMPLAINT**

Plaintiffs, JEFFREY G. MEYER and ANNE G. MEYER (collectively the "PLAINTIFFS"), sue the Defendant, BANK OF AMERICA, N.A., ("DEFENDANT"), and state:

1.      This is an action by PLAINTIFFS against DEFENDANT for damages. The amount in controversy is in excess of $30,000.00, exclusive of interest, costs and attorney's fees, and is within the jurisdiction of this Court.

2.      PLAINTIFFS were and are residents of Florida and are *sui juris*.

3.      At all times material, PLAINTIFFS owned the property located at 9441 Old A1A, St. Augustine, Florida ("Property").

4.      DEFENDANT is a Delaware corporation and national banking association insured by the Federal Deposit Insurance Corporation. DEFENDANT has its principal place of business in Charlotte, North Carolina. DEFENDANT provides services including, but not limited to, banking, insurance, investments, property mortgages and consumer and commercial finance in Florida, and across North America.

*Complaint*

5.    On or about August 27, 2002, PLAINTIFFS borrowed the principal amount of $425,941.81 from Merrill Lynch for the purchase of the Property and also secured insurance for the Property through Merrill Lynch.  *See* Mortgage, a copy of which is attached as **Exhibit "A"**.

6.    In or about August 2017, Merrill Lynch merged with DEFENDANT, resulting in the transfer of PLAINTIFFS' loan to DEFENDANT.

7.    However, simultaneously, and for reasons not yet known, PLAINTIFFS' insurance with Merrill Lynch was terminated.

8.    Due to the approach of Hurricane Irma, PLAINTIFFS were unable to obtain new coverage.

9.    As a result, DEFFENDANT procured residential property insurance coverage for PLAINTIFFS' Property from Integon National Insurance Company ("Integon").

10.    On or about September 1, 2017, DEFENDANT force placed property insurance coverage through Integon on PLAINTIFFS' Property.

11.    DEFENDANT's procurement of forced placed insurance takes advantage of the discretion afforded lenders and/or servicers in standard form mortgage agreements.   The agreements typically require the borrower to carry hazard insurance sufficient to cover the lender's interest in the property against fire and other perils, including flood.  If a homeowner's hazard or flood policy lapses, the mortgage agreement allows the lender to force place a new policy on the property at the borrower's expense.

12.    Integon issued Master Policy No. 4800-0100 to DEFENDANT, which provides among other things, residential property insurance coverage to the named insured, DEFENDANT, covering PLAINTIFFS' Property for the twelve-month period beginning September 1, 2017.  True

and correct copies of the Declarations Page and Insurance Policy (collectively "Insurance Contract") are attached as **Composite Exhibit "B."**

13.    The Insurance Contract provides a coverage limit of $985,000.00 for the Property. *See* **Composite Exhibit "B."**

14.    As of the date of the filing of this action, PLAINTIFFS' have paid their Mortgage in full.

15.    Integon charged a premium of $17,746.00 for the Insurance Contract,

16.    Upon information and belief, Integon paid a percentage of the force-placed premium for PLAINTIFFS' Property coverage in the form of a commission, a loss ratio bonus and/or as a kick-back to DEFENDANT.

17.    DEFENDANT charged PLAINTIFFS the $17,746.00 premium for Integon's coverage.

18.    PLAINTIFFS promptly paid the $17,746.00 premium to DEFENDANT for Integon's coverage.

19.    On September 10, 2017, Hurricane Irma made landfall in St. Johns County, and caused significant damages in the range of $365,153.35 to PLAINTIFFS' Property.  *See* estimate by Golden Group Consultants, LLC, a copy of which is attached as **Exhibit "C."**

20.    PLAINTIFFS timely reported their claim to Integon.

21.    Integon accepted coverage for the loss and assigned claim numbers 4294130 and 4294117 but failed to pay the full amount of PLAINTIFFS' claim, taking the position that PLAINTIFFS were not named insureds under the policy and could not assert a claim.

22.    DEFENDANT failed to provide PLAINTIFFS with any assistance concerning their pursuit or prosecution of the property claim.

JANSSEN, SIRACUSA & KEEGAN PLLC
120 S. Olive Avenue, Suite 504 * West Palm Beach, FL 33401
Telephone (561) 420-0583 * Facsimile (561) 420-0576

23.     DEFENDANT procured property insurance coverage on PLAINTIFFS' Property - purportedly on their behalf - which fails to name them as an insured or additional insured on the Insurance Contract, such that they are unable to effectively pursue any property insurance claim against Integon without DEFENDANT's cooperation or assistance in doing so.

24.     DEFENDANT force placed insurance coverage on PLAINTIFFS' Property in excess of that required to cover DEFENDANT's interest in the Property, or balance due on their loan.

25.     Upon information and belief, DEFENDANT charged PLAINTIFFS an amount beyond the actual cost of the insurance, *i.e.*, amounts that were ultimately returned to DEFENDANT or their affiliate in the form of a commission, loss ratio bonus and/or as a kick-back, pursuant to undisclosed agreements among DEFENDANT, its affiliates and their force-placed insurance provider.

26.     To date, DEFENDANT has willfully and unreasonably refused to cooperate or provide any assistance concerning PLAINTIFFS' pursuit of their Property damage claim, despite their multiple requests, and DEFENDANT's obligation to do so.

27.     Venue is proper in this forum because DEFENDANT transacts business and may be found in St. Johns County.  Venue is also proper here because at all times relevant hereto, PLAINTIFFS resided in St. Johns County, Florida and a substantial portion of the practices complained of herein occurred in St. Johns County, Florida.

28.     All conditions precedent to the filing of this action have occurred, have been waived and/or excused.

JANSSEN, SIRACUSA & KEEGAN PLLC
120 S. Olive Avenue, Suite 504 * West Palm Beach, FL 33401
Telephone (561) 420-0583 * Facsimile (561) 420-0576

## COUNT I – BREACH OF CONTRACT
*(Implied Warranty of Good Faith and Fair Dealing)*

29.     This is an action by PLAINTIFFS against DEFENDANT for damages for breach of contract.   The amount in controversy exceeds $30,000.00, exclusive of interest, attorney's fees and costs, and is within the jurisdiction of this Court.

30.     PLAINTIFFS re-alleges paragraphs 1 through 28 above, as if fully restated and set forth herein.

31.     A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance.

32.     Where an agreement affords one party the power to make a discretionary decision without defined standards, The duty to act in good faith limits the party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

33.     PLAINTIFFS' mortgage contains the following language regarding insurance requirements:

> **5.   Hazard or Property Insurance**.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which the Lender requires insurance.  This insurance shall be maintained in the amounts and for the periods that Lender requires.  The insurance carrier providing the insurance shall be chosen by the Borrower subject to Lender's approval which shall not be unreasonably withheld.  If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.
>
> *          *          *
>
> **7.   Protection of  Lender's Rights in the Property.**
>
> *          *          *

JANSSEN, SIRACUSA & KEEGAN PLLC
120 S. Olive Avenue, Suite 504 * West Palm Beach, FL 33401
Telephone (561) 420-0583 * Facsimile (561) 420-0576

*Complaint*

> **If borrower** fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property.  Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.
>
> **Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument.  Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement, at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.**

(Emphasis added.).  *See* **Exhibit "A."**

34.     PLAINTIFFS' Mortgage required them to maintain homeowner's insurance on the Property and provided that if they fail to do so, then DEFENDANT may obtain insurance coverage to protect the value of and its rights in the Property, and charge PLAINTIFFS the costs of the insurance.

35.     The Mortgage affords DEFENDANT the discretion to force place insurance coverage on PLAINTIFFS and charge them for it.     DEFENDANT is unilaterally permitted to select the company from which it purchases insurance and to negotiate the price for the coverage it procures.  As such, DEFENDANT has an obligation to exercise its discretion in good faith, and not act capriciously or in bad faith.

36.      While PLAINITFFS' Mortgage may authorize DEFENDANT to force-place insurance coverage on PLAINTIFFS' Property, it does not explicitly authorize DEFENDANT to

JANSSEN, SIRACUSA & KEEGAN PLLC
120 S. Olive Avenue, Suite 504 * West Palm Beach, FL 33401
Telephone (561) 420-0583 * Facsimile (561) 420-0576

procure insurance that does not name PLAINTIFFS as an insured or provide any guidance on how DEFENDANT is authorized to act with respect to purchasing insurance on PLAINTIFFS' behalf. Instead, Section 7, quoted above, reserves to DEFENDANT the right to "do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of … hazard insurance."

37.     DEFENDANT breached its implied warranty of good faith and fair dealing by, among other things, procuring insurance for PLAINTIFFS' Property – purportedly on their behalf – that fails to include them as a named insured or an additional insured on the Insurance Contract, such that they are unable to effectively pursue their property insurance claim against Integon, without DEFENDANT's reasonable cooperation or assistance in doing so.

38.     DEFENDANT additionally breached its implied warranty of good faith and fair dealing by force placing insurance coverage for PLAINITFFS' Property in excess of that required to cover DEFENDANT's interest in the Property, or balance due on their loan.

39.     Upon information and belief, DEFENDANT further breached its implied warranty of good faith and fair dealing by charging PLAINTIFFS an amount beyond the actual cost of the insurance, *i.e.*, amounts that were ultimately returned to DEFENDANT or their affiliate in the form of a commission, loss ratio bonus and/or as a kick-back, pursuant to undisclosed agreements among DEFENDANT, its affiliates and their force-placed insurance provider.

40.     DEFENDANT's breaches of the implied warranty of good faith and fair dealing were capricious and performed in bad faith.

41.     As a direct and proximate result of DEFENDANT's breaches of the implied warranty of good faith and fair dealing, PLAINTIFFS have suffered damages.

JANSSEN, SIRACUSA & KEEGAN PLLC
120 S. Olive Avenue, Suite 504 * West Palm Beach, FL 33401
Telephone (561) 420-0583 * Facsimile (561) 420-0576

WHEREFORE, Plaintiffs, JEFFREY G. MEYER and ANNE G. MEYER, demand judgment against Defendant, BANK OF AMERICA, N.A., for damages for breach of the implied warranty of good faith and fair dealing, including an award of interest, costs and attorney's fees, and any other and further relief the Court deems just and proper.

## COUNT II – BREACH OF FIDUCIARY DUTY

42. This is an action by PLAINTIFFS against DEFENDANT for damages for breach of fiduciary duty. The amount in controversy exceeds $30,000.00, exclusive of interest, attorney's fees and costs, and is within the jurisdiction of this Court.

43. PLAINTIFFS re-allege paragraphs 1 through 28 above, as if fully restated set forth herein.

44. DEFENDANT owed PLAINTIFFS a fiduciary duty because it took on the extra service of procuring insurance for the Property, received a greater economic benefit from the typical mortgage transaction for procuring insurance for the Property, and exercised extensive control over the procurement of force placed insurance for the Property.

45. At all times material, PLAINTIFFS placed their trust and confidence in DEFENDANT with respect to both the procurement of force place insurance for their Property, and concerning its expected cooperation or assistance concerning the pursuit of any Property damage claim.

46. At all times material, PLAINTIFFS and DEFENDANT developed and enjoyed a special relationship of trust and confidence with respect to both DEFENDANT's procurement of insurance for PLAINTIFFS, for which DEFENDANT or its affiliate upon information and belief, has received compensation in the form of a commission, loss ratio bonus or kick-back, and it's expected cooperation or assistance concerning the pursuit of their Property damage claim.

JANSSEN, SIRACUSA & KEEGAN PLLC
120 S. Olive Avenue, Suite 504 * West Palm Beach, FL 33401
Telephone (561) 420-0583 * Facsimile (561) 420-0576

*Complaint*

47.     At all times material, PLAINTIFFS relied to their detriment on DEFENDANT's procurement of insurance for PLAINTIFFS' Property, as well as DEFENDANT's expected cooperation or assistance concerning the pursuit of their Property damage claim.

48.     Accordingly, DEFENDANT owed PLAINTIFFS a fiduciary duty with respect to both DEFENDANT's procurement of insurance for PLAINTIFFS' Property, and its cooperation or assistance in the prosecution of their Property damage claim.

49.     At all times material, DEFENDANT had a duty with respect to both its procurement of insurance policies for PLAINTIFFS' Property, and its cooperation or assistance concerning the pursuit of their Property damage claim.

50.     DEFENDANT breached its fiduciary duty to PLAINTIFFS by procuring property insurance coverage for PLAINTIFFS' Property - purportedly on their behalf - which fails to name them as an insured or additional insured on the Insurance Contract, such that they are unable to effectively pursue any property insurance claim against Integon without DEFENDANT's reasonable cooperation or assistance in doing so.

51.     DEFENDANT additionally breached its fiduciary duty by force placing insurance coverage on PLAINTIFFS in excess of that required to cover DEFENDANT's interest in the Property, or balance due on their loan.

52.     DEFENDANT further breached its fiduciary duty upon information and belief, by charging PLAINTIFFS an amount beyond the actual cost of the insurance, *i.e.*, amounts that were ultimately returned to DEFENDANT or their affiliate in the form of a commission, loss ratio bonus and/or as a kick-back, pursuant to undisclosed agreements among DEFENDANT, its affiliates and their force-placed insurance provider.

JANSSEN, SIRACUSA & KEEGAN PLLC
120 S. Olive Avenue, Suite 504 * West Palm Beach, FL 33401
Telephone (561) 420-0583 * Facsimile (561) 420-0576

53.    As a direct and proximate result of DEFENDANT's breaches of its fiduciary duties, PLAINTIFFS have suffered damages.

WHEREFORE, Plaintiffs, JEFFREY G. MEYER and ANNE G. MEYER, demand judgment against Defendant, BANK OF AMERICA, N.A., for damages for breach of fiduciary duty, including an award of interest and costs, and any other and further relief the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

PLAINTIFFS demand a trial by jury on all claims, defenses and issues raised in the entire case.

DATED: September 14, 2021.

JANSSEN, SIRACUSA & KEEGAN PLLC
*Counsel for Plaintiffs, Jeffrey & Anne Meyer*
120 S. Olive Avenue, Suite 504
West Palm Beach, FL 33401
Telephone 561) 420-0583
Facsimile (561) 420-0576
Email: jjanssen@jasilaw.com
Email: jsiracusa@jasilaw.com

By: ***s/ Joseph W. Janssen, III***
    JOSEPH W. JANSSEN, III
    Florida Bar No. 160067
    JOHN M. SIRACUSA
    Florida Bar No. 159670

# EXHIBIT "A"

Acct. No.: ▓▓▓▓

**STEWART TITLE**

```
Public Records of
St. Johns County, FL
Clerk# 02-051160
O.R. 1807 PG 1259
03:52PM 09/03/2002
REC $57.00    SUR $7.50
Doc Stamps $1,750.00
Int Tax $1,000.00
```

Prepared by:    Steve Starr

Return to:       Merrill Lynch Credit Corporation
                  4802 Deer Lake Drive East
                  Jacksonville, Florida 32246-6484
                  Attention: Loan Sale Delivery Department

*ORIGINAL*

[Space Above This Line For Recording Data]

## MORTGAGE

      **THIS MORTGAGE** ("Security Instrument") is given on August 27, 2002. The mortgagor is Jeffrey G. Meyer and Anne G. Meyer, husband and wife ("Borrower"). This Security Instrument is given to Merrill Lynch Credit Corporation and/or assigns, which is organized and existing under the laws of Delaware, and whose address is 4802 Deer Lake Drive East, Jacksonville, Florida 32246-6484 ("Lender"). Borrower owes Lender the principal sum of Five Hundred Thousand and 00/100------- Dollars (U.S. $500,000.00). This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for monthly payments, with the full debt, if not paid earlier, due and payable on September 1, 2028. This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described property located in St. Johns County, Florida:

See Attached Exhibit "A" and by this reference made a part hereof.

which has the address of 9441 Old A1a , St. Augustine, Florida 32080 ("Property Address");

      **TOGETHER WITH** all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

**FLORIDA**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**       **Form 3010 9/90**       *(page 1 of 8 pages)*
(09/07/01) PJFFLMTG Florida Mortgage

OR1807PG1260

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property in unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

**2. Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. § 2601 *et seq.* ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

**3. Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under paragraph 2; third, to interest due; fourth, to principal due; and last, to any late charges due under the Note.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Form 3010 9/90                    *(page 2 of 8 pages)*

Landmark Web Official Records Search

OR1807PG1261

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

    **5. Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

    All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

    Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

    Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

    **6. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

    **7. Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

                                          **Form 3010 9/90**                *(page 3 of 8 pages)*

Landmark Web Official Records Search

OR1807PG1262

    Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

    **8. Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

    **9. Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

    **10. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

    In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

    If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

    Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

    **11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

    **12. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**Form 3010 9/90**       *(page 4 of 8 pages)*

Landmark Web Official Records Search

OR1807PG1263

**13. Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

**14. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**15. Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**16. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

**19. Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

**20. Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

Form 3010 9/90

*(page 5 of 8 pages)*

Landmark Web Official Records Search

OR1807PG1264

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

21. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraph 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

22. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

23. **Attorneys' Fees.** As used in this Security Instrument and the Note, "attorneys' fees" shall include any attorneys' fees awarded by an appellate court.

24. **Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument.

[Check applicable box(es)]

| | |
|---|---|
| [ X ] Adjustable Rate Rider | [ ] Condominium Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider |
| [ ] 1-4 Family Rider | [ ] PF 1 Month Adjustable Rate Rider |
| [ ] Second Home Rider | [ ] Fixed/Adjustable Rate Rider |
| [ X ] Construction/Permanent Loan Rider | [ ] Other(s) [specify] |

Form 3010 9/90      *(page 6 of 8 pages)*

OR1807PG1265

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____

SIGNATURE OF WITNESS

BLAKE F. DEAL, III

_____

TYPE OR PRINT NAME OF WITNESS

_____

SIGNATURE OF WITNESS

ALEXIS THOMPSON

_____

TYPE OR PRINT NAME OF WITNESS

_____

SIGNATURE OF WITNESS

_____

TYPE OR PRINT NAME OF WITNESS

_____

SIGNATURE OF WITNESS

_____

TYPE OR PRINT NAME OF WITNESS

_____(Seal)
Jeffrey G. Meyer
-Borrower

_____(Seal)
Anne G. Meyer
-Borrower

_____(Seal)
-Borrower

_____(Seal)
-Borrower

COPY

**Form 3010 09/90**          *(page 7 of 8 pages)*

Landmark Web Official Records Search

OR1807PG1266

_____ [Space Below This Line For Acknowledgment] _____

STATE OF FLORIDA                    )

COUNTY OF  ST. JOHNS               )

The foregoing instrument was acknowledged before me this
27th  day of    August      ,  2002 , by
Jeffrey G. Meyer                        who is personally
known to me or who has produced
as identification.            DRIVERS LICENSE

Husband & Wife

Name: _____ BLAKE F. DEAL, III
Notary Public, State of Florida
Commission No. _____
My Commission Expires: _____

Blake F. Deal, III
MY COMMISSION # CC786807 EXPIRES
October 29, 2002
BONDED THRU TROY FAIN INSURANCE, INC.

STATE OF FLORIDA                    )

COUNTY OF  ST. JOHNS               )

The foregoing instrument was acknowledged before me this
27th  day of    August      ,  2002 , by
Anne G. Meyer                        who is personally
known to me or who has produced  DRIVERS LICENSE
as identification.

Name: _____ BLAKE F. DEAL, III
Notary Public, State of Florida
Commission No. _____
My Commission Expires: _____

Blake F. Deal, III
MY COMMISSION # CC786807 EXPIRES
October 29, 2002
BONDED THRU TROY FAIN INSURANCE, INC.

STATE OF FLORIDA                    )

COUNTY OF _____)

The foregoing instrument was acknowledged before me this
_____ day of _____, _____, by
_____ who is personally
known to me or who has produced _____
as identification.

Name: _____
Notary Public, State of Florida
Commission No. _____
My Commission Expires: _____

STATE OF FLORIDA                    )

COUNTY OF _____)

The foregoing instrument was acknowledged before me this
_____ day of _____, _____, by
_____ who is personally
known to me or who has produced _____
as identification.

Name: _____
Notary Public, State of Florida
Commission No. _____
My Commission Expires: _____

**Form 3010 09/90**                    *(page 8 of 8 pages)*

OR1807PG1267

EXHIBIT "A"

BLOCK 60, TOGETHER WITH THE VACATED ALLEYS OR ROADS LYING
ADJACENT TO AND SOUTH OF BLOCK 60, ALL ACCORDING TO PLAT AND
SURVEY OF FRACTIONAL SECTIONS 30 AND 31, TOWNSHIP 9 SOUTH,
RANGE 31 EAST, SUMMER HAVEN SUBDIVISION, AS RECORDED IN MAP
BOOK 1, PAGE 155, PUBLIC RECORDS OF ST. JOHNS COUNTY, FLORIDA.
EXCEPTING THEREFROM ANY PART THEREOF LYING WITHIN THE
RIGHT-OF-WAY OF FORMER A-1-A AND STATE ROAD A-1-A AS PRESENTLY
ESTABLISHED.



OR1807PG1268

# CONSTRUCTION/PERMANENT LOAN RIDER

**THIS CONSTRUCTION/PERMANENT LOAN RIDER**, dated August 27, 2002, is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to Merrill Lynch Credit Corporation (the "Lender") of the same date.

**ADDITIONAL COVENANTS:** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

1. The Security Instrument is given to secure not only existing indebtedness, but also future advances, whether such advances are obligatory or are to be made at the option of Lender, or otherwise, as are made within 20 years from the date of the Security Instrument, to the same extent as if such future advances were made on the execution of the Security Instrument. The total amount of indebtedness that may be so secured may decrease or increase from time to time, but the total unpaid balance so secured at one time shall not exceed twice the face amount of the Note, plus interest thereon, and any disbursements made for payment of taxes, levies or insurance on the Property, with interest on such disbursements at the highest rate permitted by applicable law. Borrower agrees that it shall not execute or file for recording any notice limiting the maximum principal amount that may be secured under the Security Instrument, and Borrower agrees that any action it may take to limit those advances shall be a default under the Security Instrument. Some future advances are to be made pursuant to the terms of a Construction Loan Agreement between Borrower and Lender of the same date. The Construction Loan Agreement is a "construction loan agreement" for purposes of Section 697.04, Florida Statutes. A default under the terms of the Construction Loan Agreement shall also constitute a default under the terms of the Security Instrument. Except for the provisions of this paragraph 1, this Rider and the Construction Loan Agreement shall be deemed to be of no further force and effect on the earlier of the following dates:

(i) the date of satisfactory completion of construction of the improvements in accordance with the terms of the Construction Loan Agreement, or

(ii) August 31, 2003 (the "Scheduled Termination Date"), unless prior thereto either (a) a Notice of Trustee's Sale is recorded, (b) Lender files a lis pendens or an equivalent document as required to provide notice that Lender intends to judicially foreclose the lien of its Security Instrument or (c) Lender extends the maturity date of the Note by filing one or more notices in the official public records where the Security Instrument is recorded stating that this Rider remains in effect and stating a new Scheduled Termination Date after which this Rider shall no longer be deemed of any force and effect. It is understood and agreed that Lender may unilaterally extend the Scheduled Termination Date on one or more occasions without the joinder or consent of Borrower.

2. Lender shall not require Borrower to maintain an escrow account for the payment of yearly hazard or property insurance premiums as required by the Security Instrument until the earlier of the two dates specified in paragraph 1.

CTP Loan Rider - ARM FL
(06/07/00) CTPARRFL (Y)
6389969

*(page 1 of 2 pages)*

OR1807PG1269

3.  During the period of construction as set forth in the Construction Loan Agreement, the interest rate may change on the first day of each month and shall be equal to the sum of 00.00000% plus the highest prime rate published in The Wall Street Journal "Money Rates" table as of the last business day of the preceding month (the "Prime Rate").  During this period and until the earlier of the two dates specified in paragraph 1, the interest rate will never be greater than 18%.  Thereafter, the maximum interest rate will be as set forth in paragraph 4(D) of the Adjustable Rate Rider or Fixed/Adjustable Rate Rider, as the case may be, attached to the Security Instrument.

4.  Provided that no default exists under the terms of the Loan documents and that Borrower has first obtained Lender's prior written consent, which consent may be withheld by Lender in its absolute discretion, the date set for completion of construction may be extended on a one-time only basis for an additional period of up to six months.  All the terms and conditions of the Note shall continue to apply during any such extension approved by Lender, except that all future interest rate changes which may occur through and including the extended Commencement Date shall be calculated by adding 00.00000% plus 0.25% to the Prime Rate.  Borrower agrees to execute any additional documentation which Lender may request to confirm the extension.

5.  Further Advances.  This Security Instrument shall secure not only existing indebtedness, but also such future advances, whether such advances are obligatory or are to be made at the option of Mortgagee, or otherwise, as are made by Mortgagee to Mortgagor within twenty years from the date hereof, to the same extent as if such future advances were made on the date of the execution of this Security Instrument.  The total amount of indebtedness that may be so secured may decrease or increase from time to time, but the total unpaid balance so secured at any one time shall not exceed a maximum principal amount equal to twice the face amount of the Note, plus interest thereon, and any disbursements made for the payment of taxes, levies or insurance on the Property, with interest on such disbursements at the rate applicable under the Note from and after maturity.

BY SIGNING BELOW, Borrower(s) accepts and agrees to the terms and covenants contained in this Rider.

_____ (Seal)          _____ (Seal)
Jeffrey G. Meyer                                      Anne G. Meyer
Borrower                                              Borrower

_____ (Seal)          _____ (Seal)
Borrower                                              Borrower

_____ (Seal)          _____ (Seal)

*(page 2 of 2 pages)*

OR1807PG1270

# ADJUSTABLE RATE RIDER

### (Six Months- Wall Street Journal 6 Months LIBOR Index)

**THIS ADJUSTABLE RATE RIDER** is made this 27th day of August, 2002, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed *(the "Security Instrument")* of the same date given by the undersigned *(the "Borrower")* to secure Borrower's Adjustable Rate Note *(the "Note")* to **Merrill Lynch Credit Corporation**, a Delaware corporation *(the "Lender")* of the same date and covering the property described in the Security Instrument and located at:

9441 Old A1a  St. Augustine, Florida  32080
                     (Property Address)

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS:** As used below, the "Commencement Date" is September 1, 2003. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for changes in the interest rate and the monthly payments, as follows:

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of March, 2004, and on that day every sixth (6th) month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month dollar deposits in the London market based on quotations of major banks as published in The Wall Street Journal "Money Rates" table. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

Construction Loan - Rider
(06/19/00) CONLNSTR (Y)
6389969

*(page 1 of 3 pages)*

OR1807PG1271

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C)  Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding one and five eighths percentage point (1.625%) to the Current Index. The Note Holder will then round this figure to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

(i) **Interest-Only Period.** The "interest-only period" is the period from the date of this Note through August 31, 2013. For the interest-only period, after calculating my new interest rate as provided above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to pay the interest which accrues on the unpaid principal of my loan. The result of this calculation will be the new amount of my monthly payment.

(ii) **Amortization Period.** The "amortization period" is the period after the interest-only period. For the amortization period, after calculating my new interest rate as provided above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D)  Limit on Interest Rate Changes**

My interest rate will never be greater than 12.00%.

**(E)  Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)  Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

*(page 2 of 3 pages)*

OR1807PG1272

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
Jeffrey G. Meyer
Borrower

_____ (Seal)
Anne G. Meyer
Borrower

_____ (Seal)

Borrower

_____ (Seal)

Borrower

_____ (Seal)

_____ (Seal)

*(page 3 of 3 pages)*

# COMPOSITE EXHIBIT "B"

# COPY CERTIFICATION BY DOCUMENT CUSTODIAN

State of Texas          §

County of Dallas        §


I, Kenneth Mark Davidson (Affiant), hereby declare that the attached reproduction of **Integon National Insurance Company Policy No. G5000679** is a true, correct, and complete copy of a document in my possession or control.

Kenneth Mark Davidson
4455 LBJ Freeway, Suite 500
Dallas, TX 75244


BEFORE ME, the undersigned authority, personally appeared KENNETH MARK DAVIDSON, who being first duly sworn and cautioned, and who is personally known to me, stated that the information contained herein is true and correct to the best of his knowledge.

SWORN TO AND SUBSCRIBED before me on this 22nd day of March 2019.

NOTARY PUBLIC, State of Texas

STACEY J. SALAS
Notary Public, State of Texas
Comm. Expires 07-01-2020
Notary ID 130726009

**NOTICE OF LENDER-PLACED INSURANCE**

Residential Property Hazard Insurance

**Hazard Insurance Protection**

**INTEGON NATIONAL INSURANCE COMPANY**

5630 University Parkway
Winston Salem, NC 27105

Date: 02/18/2018

Control Number:  G5000679
Policy Number:  4800-0100
Loan Number:  ███████████

| NAMED INSURED: | BORROWER: |
|---|---|
| BANK OF AMERICA, N.A. | JEFFREY G MEYER |
| P.O. BOX 961291 | ANNE G MEYER |
| FORT WORTH, TX 76161 | 4901 VANDIVEER RD |
| | JACKSONVILLE, FL 32210 |

COVERAGE PERIOD: From: 09/01/2017 Until: 09/01/2018, beginning and ending at 12:01 A.M. Standard Time at the DESCRIBED LOCATION.

DESCRIBED LOCATION:
9441 OLD A1A
ST AUGUSTINE FL 32080

LIMIT OF LIABILITY FOR RESIDENTIAL PROPERTY:

$985,000.00

| DEDUCTIBLES: | | |
|---|---|---|
| | Hazard | $1,000.00 |
| | Vandalism & Malicious Mischief | $1,000.00 |
| | Wind & Hail | GREATER OF $2,000 OR 2% OF COVERAGE AMOUNT |

| PREMIUM: | Insurance Premium: | $17,746.00 |
|---|---|---|
| | Hurricane Catastrophe Fund Assessment: | 00.000% |
| | Department of Revenue Fee (EMPATF): | $2.00 |
| | Total: | $17,748.00 |

The NAMED INSURED has purchased insurance on the DESCRIBED LOCATION for the amount and premium indicated above.

The contract of insurance is only between the NAMED INSURED and Integon National Insurance Company. There is no contract of insurance between the BORROWER and Integon National Insurance Company. The insurance purchased is intended for the benefit and protection of the NAMED INSURED, insures against LOSS only to the dwelling and OTHER STRUCTURES on the DESCRIBED LOCATION, and may not sufficiently protect the BORROWER'S interest in the property. No coverage is provided for contents, personal effects, additional living expense, fair rental value or liability unless otherwise endorsed in this Policy. NO COVERAGE IS PROVIDED FOR LOSS CAUSED BY EARTHQUAKE OR FLOOD or any other cause of loss that is excluded by the Residential Property Hazard Insurance Form. The NAMED INSURED may cancel the insurance coverage at any time.

This NOTICE is for informational purposes only. It does not amend, extend, or alter the insurance contained in the Residential Property Hazard Insurance Form. Any coverage provided is subject to the terms, conditions, limitations and exclusions contained in the Residential Property Hazard Insurance Form.

To report a claim, call: (800) 323-7466
For other inquires, call: (866) 265-3321

31A09-09NT0007-E1115

Page 1 of 1

Hazard Insurance Protection

## LENDER'S GENERAL FORM

### INSURING AGREEMENT

In consideration of the payment of the premium, and subject to all provisions of the policy forms and endorsements attached to this LENDER'S GENERAL FORM, WE agree to indemnify YOU or YOUR legal representatives for any amount that YOU may be entitled to recover as the result of a covered LOSS.

### DEFINITIONS

Whenever used in this Policy, the following words shall have the meanings as shown herein:

"YOU", "YOUR", and "YOURS" means the NAMED INSURED shown on the DECLARATIONS PAGE issued to YOU by US.

"WE", "US", "OUR" and "OURS" means the Company providing this insurance as shown on the DECLARATIONS PAGE.

"DECLARATIONS PAGE" means the DECLARATIONS PAGE issued to YOU which identifies YOU and the Policy Period and Maximum Amounts of Insurance applying to the Policy issued to YOU.

"LOSS" is defined in the Policy which this LENDER'S GENERAL FORM is attached.

"NOTICE OF INSURANCE," means the form issued as notice of insurance purchased by YOU. A NOTICE OF INSURANCE form specifies the DESCRIBED LOCATION, amount, and term of insurance for the PROPERTY that YOU have requested be insured by US under the applicable Policy.

"POLICY" refers to the policy form or forms to which this LENDER'S GENERAL FORM is attached and issued to YOU as shown on the DECLARATIONS PAGE (referred to herein as "the Policy").

"PROPERTY" means the improvements to the real property described on the NOTICE OF INSURANCE.

### PREMIUM

The premium charged will be computed in compliance with the rates used by US on the effective date of the subject NOTICE OF INSURANCE.

### SPECIAL PROVISIONS

1.  COVERAGE LIMITATION. Insurance under this Policy is provided only for PROPERTY for which YOU have an insurable interest and which is reported to US when YOU become aware that required insurance for the PROPERTY has not been provided.

2.  LIMITS OF RECOVERY. The maximum amount of coverage applicable to a PROPERTY insured hereunder shall be the amount of insurance purchased by YOU, as stated on the NOTICE OF INSURANCE, less the applicable deductible. OUR settlement options are specified in the provisions of the Policy forms to which this LENDER'S GENERAL FORM is attached.

3.  OTHER INSURANCE. YOU and WE agree that the insurance provided under the Policy has been requested by YOU because YOU believe that no other insurance acceptable to YOU is in force to protect the PROPERTY.

    Insurance under the Policy will automatically terminate on the effective date and time of any other insurance coverage acceptable to YOU. WE shall not make any payment for LOSS to PROPERTY if other insurance acceptable to YOU is in force on the DATE OF LOSS.

00A09-00MP0001-E1115

In no event shall this insurance apply on a pro-rata or contributing basis. Insurance under this Policy does not supplement other insurance that provides inadequate limits of coverage or that contains more restrictive terms than the terms of this Policy.

4.  TERMINATION. YOU may cancel the Policy to which this LENDER'S GENERAL FORM is attached at any time by giving written notice to US stating when, thereafter, such cancellation shall be effective. WE may cancel this Policy for non-payment of premium if WE have given YOU at least fifteen (15) days written notice at YOUR last address known to US or at least sixty (60) days written notice if the cancellation is for any reason other than non-payment of premium. This Policy shall cease at 12:01 A.M. at YOUR address shown on the DECLARATIONS PAGE on the date of cancellation specified in the notice.

If this Policy is cancelled, whether by YOU or US, all in-force insurance on PROPERTY for which a NOTICE OF INSURANCE has been issued shall be cancelled concurrently with the cancellation of this Policy unless WE send a notice to YOU stating that the insurance referenced on the NOTICE OF INSURANCE will remain in effect. If WE give notice that any such insurance on specific PROPERTY will remain in effect after cancellation of the Policy, the insurance on the specific PROPERTY will then remain in force until the expiration date of such insurance or until the insurance on the specific PROPERTY has been cancelled in compliance with the cancellation provisions of the coverage forms to which this LENDER'S GENERAL FORM is attached. Provided however, WE reserve the right to cancel insurance referenced in any or all NOTICES OF INSURANCE upon at least fifteen (15) days written notice if such cancellation is for non-payment of premium, or at least sixty (60) days written notice if cancellation is for any reason other than non-payment of premium.

5.  INSPECTION AND AUDIT. WE shall be permitted, at all reasonable times, to inspect the insured PROPERTY and to examine YOUR books and records insofar as those records pertain to any claims made because of any LOSS. This includes, but is not limited to, the right to review YOUR records for information about any other insurance in force for the PROPERTY and information regarding the net loan balance, both at the time the insurance referenced on the NOTICE OF INSURANCE is effective and on the DATE OF LOSS. This right shall remain in force for twelve (12) months after all insurance referenced on the NOTICES OF INSURANCE issued under the Policy to which this LENDER'S GENERAL FORM is attached have been cancelled or have expired. This right shall also remain in force for twelve (12) months after each LOSS has been fully settled by payment or otherwise.

6.  STATE-SPECIFIC TERMS AND CONDITIONS. The terms and conditions applying to the insurance referenced in a NOTICE OF INSURANCE may vary depending upon the forms approved by the state where the PROPERTY is located.

7.  CHANGES OF PROVISIONS. No change may be made to any provision of this LENDER'S GENERAL FORM except by written endorsement issued by US. No other written changes or oral changes will be valid.

8.  ASSIGNMENT. There shall be no valid assignment of YOUR rights including assignment of rights under the Policy regarding claims settlement and post loss assignment under the Policy unless WE have given OUR advanced written consent to YOU.

00A09-00MP0001-E1115

Hazard Insurance Protection

## RESIDENTIAL PROPERTY HAZARD INSURANCE FORM

### INSURING AGREEMENT

In consideration of the premium paid, and subject to the Limits of Liability, EXCLUSIONS, CONDITIONS and other terms contained in the LENDER'S GENERAL FORM and this RESIDENTIAL PROPERTY HAZARD INSURANCE FORM ("RESIDENTIAL PROPERTY FORM"), WE agree to indemnify YOU for a LOSS not to exceed the amount issued for the DESCRIBED LOCATION. This insurance applies to LOSS by the perils insured against to real property. No coverage is provided for contents, personal effects, additional living expense, fair rental value or liability.

### DEFINITIONS

Whenever used in this RESIDENTIAL PROPERTY FORM, the following words shall have the meanings as shown herein:

"YOU", "YOUR", and "YOURS" means the NAMED INSURED shown under Item 1 on the DECLARATIONS PAGE of the Policy, under which the insurance on the DESCRIBED LOCATION has been issued, which has an interest in the RESIDENTIAL PROPERTY described in the NOTICE OF INSURANCE as the direct result of a first mortgage, second mortgage, other lien instrument, or an agreement for the servicing or subservicing of such contracts.

"WE", "US", "OUR" and "OURS" means the Company providing this insurance as shown on the Declarations page.

"ACTUAL CASH VALUE" means the amount it would take to repair or replace the damaged property on the DATE OF LOSS with material of like kind and quality, subject to deduction for deterioration, depreciation or obsolescence, and contractor's overhead and profit. ACTUAL CASH VALUE applies to valuation of property whether the property has sustained partial or total LOSS.

"BORROWER" means the person(s) or entity identified as the BORROWER on the NOTICE OF INSURANCE.

"DATE OF LOSS" means the date on which the LOSS occurred if the claim is being submitted by YOU or the BORROWER. If the DATE OF LOSS cannot be verified, then the date WE are notified will be the DATE OF LOSS, unless the DATE OF LOSS can be determined based on verifiable information provided by YOU, the BORROWER, or obtained by US.

"DECLARATIONS PAGE" means the DECLARATIONS PAGE of the Policy, which identifies YOU and the Policy Period applying to the Policy.

"DESCRIBED LOCATION" means the location identified as the DESCRIBED LOCATION on the NOTICE OF INSURANCE.

"FUNGI" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by FUNGI.

"LOSS" means direct, sudden and accidental physical damage ato the RESIDENTIAL PROPERTY or OTHER STRUCTURES, caused by an insured peril, or the theft of all or part of the covered RESIDENTIAL PROPERTY or OTHER STRUCTURES.

"NOTICE OF INSURANCE," means the form issued as notice of insurance purchased by YOU. A NOTICE OF INSURANCE form specifies the DESCRIBED LOCATION, amount, and term of insurance for the individual RESIDENTIAL PROPERTY that has been insured by US at YOUR request.

"OTHER STRUCTURES" means permanently installed structures on the DESCRIBED LOCATION, which are separated from the dwelling structure by clear space or connected to the dwelling structure by only a fence, utility line or similar connection. OTHER STRUCTURES does not include doll houses, tree houses and dog houses or structures that are used or partially used for commercial, farming, or manufacturing purposes, or are rented or held for rental to any person not a tenant of the dwelling structure, unless used solely as a private garage. Land, including the land on which OTHER STRUCTURES are located, is not covered property.

"POLICY" means the Policy as defined on the DECLARATIONS PAGE (referred to herein as "the Policy").

"RESIDENTIAL PROPERTY" means the one to four-unit dwelling structure located at the DESCRIBED LOCATION, which is designed, intended, and used principally for dwelling purposes, and structures attached to the dwelling structure. Land, including the land on which the RESIDENTIAL PROPERTY is located, is not covered property.

"UNPAID PRINCIPAL BALANCE" means, at the time of the LOSS, the BORROWER'S unpaid balance, less unearned interest and finance charges, less unearned insurance premiums, less collection and foreclosure expenses, and less late charges and penalties added to the BORROWER'S unpaid balance after the inception date of this Policy.

"VOLCANIC EVENT" means LOSS caused by the blast or airborne shock waves, ash, dust, or flow of lava from the eruption of a volcano. One (1) or more volcanic eruptions that occur within a 72-hour period will be considered as one volcanic eruption.

## OTHER COVERAGES

1.  Other Structures. This RESIDENTIAL PROPERTY FORM provides coverage for LOSS to OTHER STRUCTURES at the DESCRIBED LOCATION for an amount not to exceed 10% of the RESIDENTIAL PROPERTY Limit of Liability shown on the NOTICE OF INSURANCE. This is an additional coverage amount that will not reduce the Limit of Liability that applies to the RESIDENTIAL PROPERTY.

2.  Debris Removal. WE will pay YOUR reasonable expenses incurred for the removal of debris due to a LOSS. This expense is included in and will reduce the Limit of Liability that applies to the damaged property.

3.  Emergency Repairs. In the event of a LOSS, WE will pay the reasonable cost incurred for necessary repairs that are made solely to protect the RESIDENTIAL PROPERTY or OTHER STRUCTURES from further LOSS. This expense is included in and will reduce the Limit of Liability that applies to the damaged property.

4.  Collapse. WE will pay for LOSS to the RESIDENTIAL PROPERTY or OTHER STRUCTURES that result from the actual collapse of a building or any part of a building only if such collapse is caused by one or more of the following:

    a.  Hidden decay;

    b.  Hidden insect or vermin LOSS;

    c.  Weight of contents, equipment, animals or people;

    d.  Weight of rain, ice, sleet or snow that collects on the RESIDENTIAL PROPERTY or OTHER STRUCTURES;

    e.  Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of construction, remodeling or renovation.

    LOSS to an awning, fence, patio, pavement, underground pipe, swimming pool, flue, cesspool, septic tank, drain, foundation, retaining wall, bulkhead, pier, dock or wharf is not provided under this coverage unless the damage is a direct result of the collapse of a structure. This coverage does not include settling, cracking, shrinking, bulging or expansion.

    This expense is included in and will reduce the Limit of Liability that applies to the damaged property.

## INSURED PERILS AND GENERAL EXCLUSIONS

WE insure YOU for LOSS. However, WE do not insure YOU for LOSS caused directly or indirectly by, consisting of, or resulting from, any of the following perils. Such LOSS is excluded regardless of any other cause or event contributing concurrently with or in any sequence to the LOSS:

1.  Wear and tear, marring, deterioration, inherent vice, latent defect, freezing, rust, corrosion, neglect before or after a LOSS, mechanical or structural breakdown or failure, abusive use, or defective, faulty, or inadequate maintenance, design, construction, remodeling, planning, zoning, surveying or siting of the RESIDENTIAL PROPERTY or OTHER STRUCTURES. Incomplete remodeling is considered defective, faulty or inadequate remodeling. If any of these cause an ensuing LOSS as a result of the sudden and accidental escape of water from a plumbing, heating or air conditioning system or household appliance, WE cover LOSS caused by the water. WE also cover the cost of tearing out and replacing any part of a building necessary to repair the system or appliance from which this water escaped. WE do not cover LOSS to the system or appliance from which this water escaped;

2.  Contamination, asbestos, pollution, smog, or vapors;

3.  Smoke from agricultural smudging or industrial operations;

4.  Flood, meaning a general, temporary condition of complete or partial covering or inundation of normally dry land areas from:

    a.  The overflow of tidal or inland water, including streams, oceans, rivers or lakes; or

    b.  The run-off or build-up of surface water from any source; or

    c.  Mudslides or mudflows caused by the build-up of water on or under the ground; or

    d.  The sinking, collapse or movement of land along the shore of a body of water as a result of undermining or erosion caused by waves, flow, or currents of water exceeding normal levels.

    However, ensuing LOSS resulting from fire or explosion will be covered;

5.  Water that backs up through or overflows from sewers, drains, plumbing lines, or sumps, however caused, if the origin of such backup or overflow is located off the DESCRIBED LOCATION;

6.  Water below the surface of the ground or LOSS from the pressure exerted by such water, including its flow, seepage or leakage through foundations, walls, floors, basements, doors, windows, sidewalks, driveways, or any other opening;

7.  Earth movement caused by, resulting from, or contributed to by, or aggravated by earthquake; landslide; the elevation, sinking, or shifting of land or soil, even if such earth movement is a result of volcanic action or flood, except a VOLCANIC EVENT, unless LOSS by a fire or explosion ensues, in which case WE will pay only for the ensuing fire or explosion LOSS;

8.  War, whether declared or not, insurrection, revolution, civil war, rebellion, warlike act by a military force or the personnel of any military force, seizure, destruction or use for a military purpose, including any consequence of any of these. The detonation or discharge of any nuclear weapon shall be deemed an act of war, even if done accidentally;

9.  Nuclear reaction, radiation or radioactive contamination, or any consequence of any of these, and LOSS caused by these shall not be considered LOSS by fire, explosion, or smoke, whether those perils be covered or not by the RESIDENTIAL PROPERTY HAZARD INSURANCE FORM;

10. Collapse, settling, shrinking, cracking, expansion or bulging of pavements, foundations, floors, walls, ceilings, patios, walkways or driveways, except as provided for under the OTHER COVERAGES portion of this RESIDENTIAL PROPERTY FORM;

11. Freezing of any heating, plumbing, or air conditioning system or any household appliance, or by the leakage, overflow or discharge from within the system or appliance caused by freezing during any period while the RESIDENTIAL PROPERTY or OTHER STRUCTURES is under construction, but only if the RESIDENTIAL PROPERTY or OTHER STRUCTURES is under construction, unless YOU have:

    a.  Maintained heat in the building, or

    b.  Turned off the water supply and drained water from the system and appliances.

12. Freezing of, thawing of, or the pressure or weight of water, ice, sleet or snow on, a fence, pavement, patio, swimming pool, foundation, retaining wall, bulkhead, pier, wharf or dock, whether driven by wind or not, except for collapse caused by the weight of rain, ice, sleet or snow as provided for under the OTHER COVERAGES section of this RESIDENTIAL PROPERTY FORM;

13. Constant or repeated seepage or leakage of water or steam from a plumbing, heating or air conditioning system or any household appliance;

14. Theft of any property not attached to or part of the RESIDENTIAL PROPERTY or OTHER STRUCTURES or theft of any part of the RESIDENTIAL PROPERTY or OTHER STRUCTURES while undergoing construction, remodeling or repair;

15. Hail, ice, snow, sleet or wind to any outdoor antennas, dishes, or aerials, including their lead-in wiring, supports, towers and masts;

16. Birds, rodents, reptiles, other animals, insects, fish vermin;

17. FUNGI, wet or dry rot, viruses, bacteria, or pathogenic organisms, including spores, scents or by-products produced or released by any of these;

18. Acts or decisions of any person, group, governmental body or organization, including the failure to act or decide;

19. Power outage, meaning the interruption of power or other utility service, if such interruption takes place away from the RESIDENTIAL PROPERTY or OTHER STRUCTURES. If an ensuing LOSS to the RESIDENTIAL PROPERTY or OTHER STRUCTURES results from the power outage, WE will pay for such ensuing LOSS if it is not otherwise excluded by this RESIDENTIAL PROPERTY HAZARD INSURANCE FORM;

20. Ordinance or Law, meaning enforcement of any ordinance or law regulating the construction, repair or demolition of any building or structure, except as expressly provided for under the Residential Property Hazard Insurance Form.

21. LOSS or damage to the interior of any building or structure, or the property inside the building or structure, caused by rain, snow, sleet, sand or dust whether driven by wind or not, unless the direct force of wind or hail damages the building or structure causing an opening in the roof or wall and the rain, snow, sleet, sand or dust enters through this opening;

22. Any structure including the personal property contained within or on the structure, located in whole or in part over water.

23. Any peril if the RESIDENTIAL PROPERTY is being used for any illegal trade or business and such use contributes in any way to the LOSS;

Under General Exclusions 1, 10, 11, 12, 13, 14, 15, and 16, any ensuing LOSS caused by any of these, if not otherwise excluded in this RESIDENTIAL PROPERTY HAZARD INSURANCE FORM, is covered.

## CONDITIONS

The following conditions apply to this RESIDENTIAL PROPERTY FORM:

1. Period of Coverage. This RESIDENTIAL PROPERTY FORM applies only to LOSS that occurs during the coverage period shown on the NOTICE OF INSURANCE.

2. Limit of Liability. No matter how many people or entities have an insurable interest in the RESIDENTIAL PROPERTY or OTHER STRUCTURES, WE will not be liable for an amount greater than the amount of insurance requested by YOU, as shown on the NOTICE OF INSURANCE, less the applicable deductible.

   OUR liability shall not exceed the least of the following, less the applicable deductible stated in the NOTICE OF INSURANCE:

   a. The Limit of Liability that applies to the damaged or destroyed RESIDENTIAL PROPERTY or OTHER STRUCTURE as shown in the NOTICE OF INSURANCE;

   b. The cost to replace or repair the damaged or destroyed RESIDENTIAL PROPERTY or OTHER STRUCTURE with material of like kind and quality, without deduction for depreciation, payable after replacement or repair is completed within a reasonable amount of time after the LOSS;

   c. The ACTUAL CASH VALUE of the damaged or destroyed RESIDENTIAL PROPERTY or OTHER STRUCTURE on the DATE OF LOSS, until such structure has been repaired or replaced.

   If the DESCRIBED LOCATION is vacant and the mortgage on the property has been declared in default by YOU at the time of a LOSS, WE shall be liable for no more than the UNPAID PRINCIPAL BALANCE at the time of LOSS.

3. Fraud or Concealment. WE will not provide coverage if YOU have intentionally concealed or misrepresented any material fact or circumstance relating to this insurance. WE will not provide coverage to the BORROWER for his/her interest in the property if the BORROWER has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance. WE will not provide coverage resulting from forgery, directly or indirectly, and/ or any dishonest fraudulent act, intentional damage or criminal act by YOU or the BORROWER.

4. YOUR duties after LOSS. When a LOSS has occurred to which this RESIDENTIAL PROPERTY FORM may apply, YOU shall see that the following duties are performed:

   a. Give US or OUR agent immediate notice of the LOSS;

   b. Protect the property from further damage, make reasonable and necessary repairs required to protect the property, and keep an accurate record of the cost of such repairs;

   c. Exhibit the damaged property to US or OUR representatives as often as WE reasonably require and submit to examination(s) under oath;

   d. Submit to US, within sixty (60) days after WE request, YOUR signed, sworn proof of loss, which sets forth, to the best of YOUR knowledge and belief:

      1) The time and cause of LOSS;

      2) YOUR interest and the interest of all others in the property and all encumbrances existing thereon;

      3) The details of any other insurance which may cover the LOSS;

00A09-00PL0004-E1115

4) Any changes in the title or occupancy of the property during the term referenced on the NOTICE OF INSURANCE;

5) Specifications of the damaged property and detailed estimates for repair of the damage.

5. LOSS Settlement. A LOSS will be settled as follows:

a. RESIDENTIAL PROPERTY and OTHER STRUCTURES, at replacement cost without deduction for depreciation if repair or replacement has been completed within a reasonable time after LOSS; at ACTUAL CASH VALUE until such repair or replacement is completed;

b. Installed carpeting, covered domestic equipment or appliances, awnings, outdoor equipment and antennas, whether or not attached to a structure, at ACTUAL CASH VALUE at the time of LOSS but not exceeding the amount necessary to repair or replace.

c. If the cost to repair or replace the damage is both:

1) Less than 5% of the amount of insurance in this Policy on the building; and

2) Less than $2,500,

YOU may disregard the replacement cost LOSS Settlement provisions and make claim under this RESIDENTIAL PROPERTY FORM for LOSS or damage to RESIDENTIAL PROPERTY or OTHER STRUCTURES on the replacement cost basis.

6. Pair or Set. In settlement of covered damage to a pair or set, WE may elect to:

a. Replace or repair any part of the pair or set;

b. Pay the difference between the ACTUAL CASH VALUE of the pair or set before the LOSS and after the LOSS.

7. Replacement of Glass. WE will pay to replace glass with safety glazing materials when required by ordinance or law.

8. Appraisal. If YOU and WE fail to agree on the amount of LOSS, either can make a written demand upon the other that the amount of LOSS be determined by appraisal. Within twenty (20) days of such written demand, each party shall select a competent and disinterested appraiser and notify the other of the appraiser selected. The two appraisers shall then select a competent and impartial umpire. If the appraisers do not agree on an umpire within fifteen (15) days, then, at the request of YOU or US, such umpire shall be selected by a judge of a court of record in the state where the RESIDENTIAL PROPERTY is located. The appraisers shall then appraise the LOSS. If the appraisers submit a written proof of agreement to US, the amount agreed upon shall prevail. If the appraisers fail to agree, they shall submit their differences to the umpire within a reasonable time. The amount agreed upon in writing and signed by any two of these three shall be the amount of the LOSS. The appraisal award shall be considered binding as to the amount of the LOSS. WE shall pay all the expenses of OUR chosen appraiser, and YOU shall pay all the expenses of YOUR chosen appraiser. Each party shall also pay for its own voluntarily-incurred expenses including, but not limited to, attorney fees or expert witness fees. Any other expenses of the appraisal, including the compensation of the umpire, shall be paid equally by YOU and US. OUR request for appraisal shall not waive any of OUR rights.

9. Other Insurance. YOU and WE agree that the insurance provided under this RESIDENTIAL PROPERTY FORM has been requested by YOU because YOU believe that no other insurance acceptable to YOU is in force to protect the RESIDENTIAL PROPERTY or OTHER STRUCTURES.

Insurance under this RESIDENTIAL PROPERTY FORM will automatically terminate on the effective date and time of any other insurance coverage acceptable to YOU. WE shall not make any payment for LOSS if other insurance acceptable to YOU is in force on the DATE OF LOSS.

In no event shall this insurance apply on a pro-rata or contributing basis. Insurance under this RESIDENTIAL PROPERTY FORM does not supplement other insurance that provides inadequate limits of coverage or that contains more restrictive terms than the terms of this RESIDENTIAL PROPERTY FORM.

10. Subrogation. WE shall be subrogated to any rights YOU have to recovery against any person(s). However, WE shall not exercise this right against the BORROWER. WE may require an assignment of rights of recovery from YOU to the extent that payment is made by US. If an assignment is sought, YOU shall sign and deliver all related papers, and shall otherwise cooperate with US and do nothing to impair OUR subrogation rights.

11. Suit Against Us. No action may be brought unless there has been compliance with the provisions of this RESIDENTIAL PROPERTY FORM and the LENDER'S GENERAL FORM, and the action is started within one (1) year, or other period of time prescribed by applicable state statute, after the DATE OF LOSS.

00A09-00PL0004-E1115

12. Repair or Replacement Option. WE may repair or replace any part of the damaged property with functionally-equivalent property if WE have given YOU or mailed to YOU at YOUR last known address, written notice of OUR intention to do so.

13. LOSS Payment. WE will adjust each LOSS with YOU and will pay YOU. If the amount of LOSS exceeds the UNPAID PRINCIPAL BALANCE, the BORROWER may be entitled, as a simple LOSS payee only, to receive payment for any residual amount due for the LOSS, not exceeding the lesser of the applicable Limit of Liability indicated on the NOTICE OF INSURANCE and the BORROWER'S insurable interest in the damaged or destroyed property on the DATE OF LOSS. Other than the potential right to receive such payment, the BORROWER has no rights under this RESIDENTIAL PROPERTY FORM.

Payment for LOSS will be made within thirty (30) days after WE reach agreement with YOU as to the amount of the LOSS or, failing that, within thirty (30) days after the entry of a final judgment or the filing of an appraisal award with US.

14. Abandonment. WE may take all, part, or none of the property for which WE have made payment, but YOU cannot abandon any property to US without OUR prior written approval.

15. No Benefit to Bailee. WE will not recognize any assignment or grant any coverage for the benefit of any person or organization holding, storing or transporting property for a fee regardless of any other provision of this RESIDENTIAL PROPERTY FORM.

16. Cancellation:

   a. YOU may cancel the insurance provided under this RESIDENTIAL PROPERTY FORM for the DESCRIBED LOCATION at any time by giving written notice to US and the BORROWER stating when, thereafter, such cancellation is to take effect. YOU may also cancel the insurance provided under the RESIDENTIAL PROPERTY HAZARD INSURANCE FORM if the BORROWER provides YOU proof of other insurance that is acceptable to YOU and insures the RESIDENTIAL PROPERTY and OTHER STRUCTURES. In such case, the effective date of cancellation will be the effective date of the other insurance provided by the BORROWER or the effective date of the insurance provided under this RESIDENTIAL PROPERTY FORM, whichever is later.

   b. WE may cancel the insurance provided under this RESIDENTIAL PROPERTY FORM for non-payment of premium if WE have provided YOU at least fifteen (15) days written notice at YOUR last address known to US or at least sixty (60) days written notice if the cancellation is for any reason other than non-payment of premium. WE may also cancel the insurance provided under this RESIDENTIAL PROPERTY FORM if WE discover that other insurance acceptable to YOU is in effect to insure the RESIDENTIAL PROPERTY and OTHER STRUCTURES, even if such other insurance is discovered after a LOSS.

   c. The completion of foreclosure proceedings on the RESIDENTIAL PROPERTY by YOU shall terminate the insurance provided under this RESIDENTIAL PROPERTY FORM. In such case, notice of foreclosure by YOU to US will be YOUR request for cancellation. Cancellation will be effective on the date the RESIDENTIAL PROPERTY is conveyed to YOU or to a third party via the foreclosure process.

   In the event of cancellation of the insurance provided under the NOTICE OF INSURANCE, any refund for unearned premium will be computed on a pro-rata basis.

17. Expiration of Insurance. If the Policy is in force upon expiration of the insurance provided under this RESIDENTIAL PROPERTY FORM, YOU may request that new insurance under this RESIDENTIAL PROPERTY FORM be issued to insure the RESIDENTIAL PROPERTY and OTHER STRUCTURES. If YOU fail to request the issuance of new insurance under this RESIDENTIAL PROPERTY FORM, the insurance on the RESIDENTIAL PROPERTY and OTHER STRUCTURES will cease upon the expiration date stated in the NOTICE OF INSURANCE. If the Policy is no longer in force upon expiration of the insurance provided under this RESIDENTIAL PROPERTY FORM, then insurance under this RESIDENTIAL PROPERTY FORM will end on its expiration date.

18. Changes of Provisions. No change may be made to any provision of this RESIDENTIAL PROPERTY HAZARD INSURANCE FORM except by written endorsement issued by US. No other written changes or oral changes of any kind will be valid. In the event of a conflict between this RESIDENTIAL PROPERTY FORM and the LENDER'S GENERAL FORM this RESIDENTIAL PROPERTY FORM shall govern.

19. Assignment. There shall be no valid assignment of YOUR rights including assignment of rights under this RESIDENTIAL PROPERTY HAZARD INSURANCE FORM regarding claims settlement and post LOSS assignment under this Policy unless WE have given OUR advanced written consent to YOU.



# SIGNATURE PAGE

In witness whereof, we, as officers of the stock Company designated on the Declarations Page, have caused this policy to be executed and attested. If required by state law, this policy shall not be valid unless countersigned by our authorized representative.

Jeffrey Weissmann

Secretary

Barry S. Karfunkel

President

Hazard Insurance Protection

## FLORIDA - AMENDATORY ENDORSEMENT

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

I.  Part 4. TERMINATION of the **SPECIAL PROVISIONS** Section of the LENDER'S GENERAL FORM is deleted and replaced with the following:

4.  TERMINATION

a.  YOU may cancel this Policy at any time by giving written notice to US stating when, thereafter, such cancellation shall be effective. If this Policy has been in effect for ninety (90) days or less and is not a renewal with US, WE may cancel for any reason by notifying YOU at least twenty (20) days before the date cancellation takes effect. WE will mail or deliver notice to YOU at YOUR last address known to US.

b.  If this Policy is cancelled, all in-force insurance on PROPERTY for which a NOTICE OF INSURANCE has been issued shall be cancelled concurrently unless the notice of cancellation states that the insurance referenced on the NOTICE OF INSURANCE will remain in effect. If the Company gives notice that any such coverage on specific PROPERTY will remain in effect after cancellation of the Policy, the coverage on the specific PROPERTY will then remain in force until the expiration date of such insurance or until the insurance on the specific PROPERTY has been cancelled in compliance with the cancellation provisions applying to the specific PROPERTY, except that the Company reserves the right to cancel insurance referenced in any or all NOTICES OF INSURANCE upon at least ten (10) days written notice if such cancellation is for non-payment of premium, or at least forty-five (45) days written notice if cancellation is for any reason other than non-payment of premium.

c.  If this Policy or NOTICE OF INSURANCE has been in effect for more than ninety (90) days, WE may cancel only for the following reason(s):

1)  Non-payment of premium;

2)  YOUR material misrepresentation or fraud used in the obtaining of this Policy;

3)  YOUR failure to comply with underwriting requirements established by US within ninety (90) days of the effective date of this Policy;

4)  There has been a substantial change in the risk covered by this Policy;

If WE cancel this policy for any of these reasons, WE will mail or deliver to the Named Insured at YOUR last known address, written notice stating when the cancellation will be effective, along with the reason(s) for cancellation, which will not be less than:

1)  Ten (10) days thereafter, if cancellation is for non-payment of premium; or

2)  One hundred and twenty (120) days thereafter, if cancellation is for the other reasons stated above.

d.  If WE elect not to renew this Policy, WE will mail written notice of non-renewal by first class mail to YOU at the last address known to US at least one hundred and twenty (120) days before the expiration date of the Policy, or the annual anniversary date if the Policy does not have a fixed expiration date. However, WE will give at least one hundred and twenty (120) days written notice, or written notice by June 1, whichever is earlier, for any nonrenewal that would be effective between June 1 and November 30. The notice will state the reason for non-renewal.

II.  **DEFINITIONS**

1.  On the RESIDENTIAL PROPERTY FORM, "ACTUAL CASH VALUE" is deleted and replaced with the following:
"ACTUAL CASH VALUE" means the amount it would take to repair or replace the damaged property on the DATE OF LOSS with material of like kind and quality, subject to deduction for deterioration, depreciation or obsolescence. ACTUAL CASH VALUE applies to valuation of property whether the property has sustained partial or total LOSS.

III.  **CONDITIONS**

RESIDENTIAL PROPERTY FORM, **CONDITIONS**, Subsection 4. YOUR duties after LOSS a. and c. are deleted and replaced with the following:

4.a. Give US or OUR agent immediate notice of the LOSS except with regard to LOSS caused by the peril of windstorm or hurricane a notice of claim, supplemental claim, or reopened claim must be given to US within three (3) years after the hurricane first makes landfall or the windstorm causes covered LOSS.

00A09-09ED0027-E1115

4.c. Exhibit the damaged property to US or OUR representatives as often as WE reasonably require and submit to examination(s) under oath. However, if we require access to YOU or to the DESCRIBED LOCATION that is the subject of a claim, WE must provide at least 48 hours notice to YOU, YOUR public adjuster or legal representative before scheduling a meeting with YOU or prior to conducting an onsite inspection of the DESCRIBED LOCATION. YOU may deny access to the DESCRIBED LOCATION if the notice has not been provided or YOU may waive the 48-hours notice.

RESIDENTIAL PROPERTY FORM, **CONDITIONS**, Subsection 11. Suit Against Us, is hereby revised by the following:

The term "one (1) year" is replaced by five (5) years.

RESIDENTIAL PROPERTY FORM, **CONDITIONS**, Subsection 13. Loss Payment, is hereby revised by the following:

Whenever the term "thirty (30) days" is used it is replaced by twenty (20) days.

RESIDENTIAL PROPERTY FORM, **CONDITIONS**, Subsection 16. Cancellation b., is deleted and replaced with the following:

b.   If this Policy or NOTICE OF INSURANCE has been in effect for less than ninety (90) days, WE may cancel the insurance provided under this RESIDENTIAL PROPERTY FORM for non-payment of premium if WE have given YOU at least ten (10) days written notice at YOUR last address know to US or at least twenty (20) days, written notice if the cancellation is for any other reason other than non-payment of premium. However, WE may cancel immediately if:

1)   YOU have used material misrepresentation or fraud in the obtaining of this Policy;
2)   YOUR failure to comply with underwriting requirements established by US within ninety (90) days of the effective date of this Policy;

At YOUR request, WE may also cancel the insurance provided under this RESIDENTIAL PROPERTY FORM if WE discover that other insurance acceptable to YOU is in effect to insure YOUR interest in the RESIDENTIAL PROPERTY and OTHER STRUCTURES, even if such other insurance is discovered after a LOSS.

COMMERCIAL PROPERTY FORM, **CONDITIONS**, Subsection 2. Limit of Liability c., is deleted and replaced with the following:

c.   The ACTUAL CASH VALUE of the damaged or destroyed COMMERCIAL PROPERTY on the DATE OF LOSS, if the damaged or destroyed COMMERCIAL PROPERTY has not been repaired or replaced.

COMMERCIAL PROPERTY FORM, **CONDITIONS**, Subsection 4. YOUR duties after LOSS a. and c. are deleted and replaced with the following:

4.a. Give US or OUR agent immediate notice of the LOSS except with regard to LOSS caused by the peril of windstorm or hurricane, notice of claim, supplemental claim, or reopened claim must be given to US within three (3) years after the hurricane first makes landfall or the windstorm causes covered LOSS.

4.c. Exhibit the damaged property to US or OUR representatives as often as WE reasonably require and submit to examination(s) under oath. However, if we require access to YOU or to the DESCRIBED LOCATION that is the subject of a claim, WE must provide at least 48 hours notice to YOU, YOUR public adjuster or legal representative before scheduling a meeting with YOU or prior to conducting an onsite inspection of the DESCRIBED LOCATION. YOU may deny access to the DESCRIBED LOCATION if the notice has not been provided or YOU may waive the 48 hours notice.

COMMERCIAL PROPERTY FORM, **CONDITIONS**, Subsection 11. Suit Against Us, is hereby revised with the following:

The term "one (1) year" is replaced by five (5) years.

COMMERCIAL PROPERTY FORM,, **CONDITIONS**, Subsection 13. Loss Payment, is hereby revised with the following:

Whenever the term "thirty (30) days" is used it is replaced by twenty (20) days.

COMMERCIAL PROPERTY FORM, **CONDITIONS**, Subsection 16. Cancellation b., is deleted and replaced with the following:

b.  If this Policy or NOTICE OF INSURANCE has been in effect for less than ninety (90) days, WE may cancel the insurance provided under the COMMERCIAL PROPERTY FORM for non-payment of premium if WE have given YOU at least ten (10) days written notice at YOUR last address know to US or at least twenty (20) days, written notice if the cancellation is for any other reason other than non-payment of premium. However, WE may cancel immediately if:

   1)  YOU have used material misrepresentation or fraud in the obtaining of this Policy;

   2)  YOUR failure to comply with underwriting requirements established by US within ninety (90) days of the effective date of this Policy;

   At YOUR request, WE may also cancel the insurance provided under the Commercial Property Form if WE discover that other insurance acceptable to YOU is in effect to insure YOUR interest in the COMMERCIAL PROPERTY, even if such other insurance is discovered after a LOSS.

MANUFACTURED HOME FORM, **CONDITIONS**, Subsection 2. Limit of Liability c., is deleted and replaced with the following:

c.  The ACTUAL CASH VALUE of the damaged or destroyed MANUFACTURED HOME or OTHER STRUCTURES on the DATE OF LOSS, if the damaged or destroyed MANUFACTURED HOME or OTHER STRUCTURES has not been repaired or replaced.

MANUFACTURED HOME FORM, **CONDITIONS**, Subsection 5. YOUR duties after LOSS is amended as follows:

5.a. LOSS or damage caused by the peril of windstorm or hurricane, notice of claim, supplemental claim, or reopened claim must be given to US within three (3) years after the hurricane first makes landfall or the windstorm causes covered LOSS.

5.c. Exhibit the damaged property to US or OUR representatives as often as WE reasonably require and submit to examination(s) under oath. However, if we require access to YOU or to the DESCRIBED LOCATION that is the subject of a claim, WE must provide at least 48 hours notice to YOU, YOUR public adjuster or legal representative before scheduling a meeting with YOU or prior to conducting an onsite inspection of the DESCRIBED LOCATION. YOU may deny access to the DESCRIBED LOCATION if the notice has not been provided or YOU may waive the 48 hours notice.

MANUFACTURED HOME FORM, **CONDITIONS**, Subsection 12. Suit Against Us, is hereby revised with the following:

   The term "one (1) year" is replaced by five (5) years.

MANUFACTURED HOME FORM, **CONDITIONS**, Subsection 15. Loss Payment, is hereby revised with the following:

   Whenever the term "thirty (30) days" is used it is replaced by twenty (20) days.

MANUFACTURED HOME FORM, **CONDITIONS**, Subsection 17. Cancellation b., is deleted and replaced with the following:

b.  If this Policy or NOTICE OF INSURANCE has been in effect for less than ninety (90) days, WE may cancel the insurance provided under this MANUFACTURED HOME FORM for non-payment of premium if WE have given YOU at least ten (10) days written notice at YOUR last address know to US or at least twenty (20) days, written notice if the cancellation is for any other reason other than non-payment of premium. However, WE may cancel immediately if:

   1)  YOU have used material misrepresentation or fraud in the obtaining of this Policy;

   2)  YOUR failure to comply with underwriting requirements established by US within ninety (90) days of the effective date of this Policy;

   At YOUR request, WE may also cancel the insurance provided under this MANUFACTURED HOME FORM if WE discover that other insurance acceptable to YOU is in effect to insure YOUR interest in the MANUFACTURED HOME and OTHER STRUCTURES, even if such other insurance is discovered after a LOSS.

All other provisions of the Policy apply.

This Endorsement is attached to and forms a part of Policy Number    4800-0100

Issued to   Bank of America, N.A.

Effective Date of this Endorsement _____    Endorsement Number _____

00A09-09ED0027-E1115                                                                    Page 3 of 3

**Hazard Insurance Protection**

## WINDSTORM OR HAIL DEDUCTIBLE

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

I.   For the premium charged, a Windstorm or Hail Deductible shown in Item 7., DEDUCTIBLE, on the DECLARATIONS PAGE applies to each RESIDENTIAL PROPERTY insured under this Policy.

II.  The Windstorm or Hail Deductible applies in the event of LOSS to RESIDENTIAL PROPERTY covered under this Policy caused directly or indirectly by, consisting of, or resulting from, the perils of windstorm or hail, subject to the applicable Policy EXCLUSIONS and CONDITIONS. Such deductible applies regardless of any other cause or event resulting from, contributing concurrently or in any sequence to the LOSS. No other deductible provision in this Policy applies to the LOSS caused by windstorm or hail.

III. (FLORIDA ONLY) The Windstorm or Hail Deductible only applies once in any one (1) calendar year to all windstorm and hail events occurring in such year.

In determining the amount, if any, that WE will pay for LOSS caused by windstorm or hail, WE will first deduct the unused portion of the Windstorm or Hail Deductible from such LOSS and pay the excess, if applicable and subject to all terms and conditions of the Policy.

All other provisions of the Policy apply.

This Endorsement is attached to and forms a part of Policy Number_____

Issued to   _____

Effective Date of this Endorsement_____   Endorsement Number _____

**00A09-00ED0011-E1115**                                                                                        **Page 1 of 1**

Hazard Insurance Protection

## WINDSTORM OR HAIL COVERAGE ENDORSEMENT

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

In consideration of the premium paid, WE agree with YOU that insurance afforded under this Endorsement amends the LENDER'S GENERAL FORM, RESIDENTIAL PROPERTY HAZARD INSURANCE FORM and the MANUFACTURED HOME HAZARD INSURANCE FORM, that make up the Policy in which YOU have an insurable interest, for a LOSS only from the perils of WIND or HAIL and not to exceed the maximum limit issued for the DESCRIBED LOCATION as shown on the NOTICE OF INSURANCE.

I.   **DEFINITIONS** is amended by the addition of the following:

"HAIL" means a precipitation in the form of small balls or lumps usually consisting of concentric layers of clear ice and compact snow.

"HURRICANE" means a storm system that has been declared to be a HURRICANE by the National Hurricane Center of the National Weather Service. The duration of the HURRICANE is the time period as follows:

1.   Beginning at the time a HURRICANE watch or HURRICANE warning is issued by the National Hurricane Center of the National Weather Service;

2.   Continuing for the time period during which the HURRICANE condition exists in the state; and

3.   Ending 72-hours following the termination of the last HURRICANE watch or HURRICANE warning issued by the National Hurricane Center of the National Weather Service for the state.

"WIND" includes windstorm, HURRICANE, wind gusts, tornadoes or cyclones.

II.   **CONDITIONS** for the purpose of this Endorsement only, 9. Other Insurance, is deleted and replaced as follows:

9.   Other Insurance. YOU and WE agree that the insurance provided under this Policy has been requested by YOU because YOU believe that no other insurance acceptable to YOU is in force to protect YOUR interest in the RESIDENTIAL PROPERTY from LOSS caused by the perils of WIND or HAIL.

Insurance under this WINDSTORM OR HAIL FORM will automatically terminate on the effective date and time of any other insurance coverage acceptable to YOU. WE shall not make any payment for LOSS if other insurance acceptable to YOU is in force on the DATE OF LOSS.

In no event shall this insurance apply on a pro-rata or contributing basis. Insurance under this Policy does not supplement other insurance that provides inadequate limits of coverage or that contains more restrictive terms than the terms of this Policy.

All other provisions of the Policy apply.

This Endorsement is attached to and forms a part of Policy Number    4800-0100

Issued to    Bank of America, N.A.

Effective Date of this Endorsement _____    Endorsement Number _____

**00A09-00ED0012-E1115**

Page 1 of 1

## INTEGON NATIONAL INSURANCE COMPANY
### Privacy Notice

*The National General Insurance Group\* is giving you this notice to tell you how we may collect and share nonpublic personal information about you and the accounts you have with a company (or companies) in the National General Insurance Group. This notice also advises you of your right to keep this information from being shared with affiliates of the National General Insurance Group\*\* or other business associates (non-affiliates) under certain circumstances and your right to limit marketing, in some cases.*

### What Nonpublic Personal Information Do We Collect About You?

We collect nonpublic personal information about you and the members of your household from the following sources:

- Information we receive from you, such as information on applications or other forms, which may include your name, address, e-mail address, social security number and driving history.
- Information about your transactions with us, our affiliates, or others, such as your account balance and payment history.
- Information we receive from outside sources such as consumer reporting agencies, insurance agencies and state motor vehicle departments which may provide information on your credit history, credit score, driving and accident history, or prior insurance coverage in place. Please note that the information obtained from outside sources may be retained by those outside sources and disclosed to other persons without our knowledge.
- Information about your computer hardware and software that may be collected by us if you contact our Website electronically. This information can include: your IP address, browser type, domain names, access times, and referring Website addresses. This information is used for the operation of the Website, to maintain quality of the Website, and to provide general statistics regarding use of our Website.
- If you obtain a life, long-term care or disability product, information we receive from you, medical professionals who have provided care to you and insurance support organizations regarding your health.

### How Do We Protect The Information That We Collect About You and Your Accounts?

To protect the privacy and security of nonpublic personal information we collect about you, we restrict access to the information to our employees, agents and subcontractors who need this information to provide products and services to you. We maintain physical, electronic, and procedural safeguards that comply with applicable federal and state laws and regulations to guard your nonpublic personal information. We strive to keep our information about you accurate. We require those individuals to whom we permit access to your customer information to protect it and keep it confidential. You may review the information we have collected and your account and if you tell us of an error, we  will update our records promptly. If you wish to review or correct personal information on your account, please write to us at the address on your account statement or other account materials.

### Do We Share The Information We Collect About You and Your Accounts?

Yes, to provide you with superior service, inform you of product and service opportunities that may be of interest to you, or for other business purposes, **we may share** all of the nonpublic personal information we collect about you and your accounts, as described above, as permitted by law. Our sharing of information about you is subject to Your Rights, described below.

However, we do not sell, rent or lease our customer lists to third parties.

We will disclose your personal information, without notice, only if required to do so by law or in the good faith belief that such action is necessary to: (a) conform to the edicts of the law or comply with legal process served on us; (b) protect and defend our rights or property; (c) act under exigent circumstances to protect the personal safety of our customers, or the public; and (d) to process insurance claims.

**For Vermont Residents Only:** Based on Vermont law, we do not share nonpublic personal information about you with affiliates or non-affiliated third parties, other than as permitted by law. We automatically treat your accounts as if you made the Information Sharing and Affiliate Marketing opt out elections described below.

### What Types of Affiliates and Non-affiliated Third Parties Do We Share Information About You With?

Subject to Your Rights, detailed below, **we may share** nonpublic personal information about you with the following types of affiliates and non-affiliated third parties:

- Financial service providers, such as, credit card issuers, insurance companies, and insurance agents.

66H01-00PN0008-R1117

- Non-financial companies, such as credit reporting agencies, manufacturers, motor vehicle dealers, retailers, direct marketers, telecommunications companies, airlines, management companies, attorneys in fact, and publishers.
- Companies that perform marketing services on our behalf or with other institutions with which we have joint marketing agreements.
- Others, such as educational institutions.
- **We may also share** nonpublic personal information about you with affiliates and non-affiliated third parties, as permitted by law, including consumer report information, such as information from credit reports and certain application information, that we have received from you and from third parties, such as consumer reporting agencies and insurance support organizations.

## Do We Share Information About Former Customers?

Yes, subject to Your Rights - detailed below, **we may share** all of the nonpublic personal information described above about our former customers with the same types of affiliates and non-affiliated third parties, as described above, as permitted by law.

## Modifications to our Privacy Policy

We reserve the right to change our privacy practices in the future, which may include sharing nonpublic personal information about you with non-affiliated third parties. Before we do that, we will provide you with a revised privacy notice and give you the opportunity to opt out of that type of information sharing.

## Your Rights:
### Information Sharing
- If you want a company in the National General Insurance Group not to share nonpublic personal information about you with affiliates, non-affiliated third parties, or both, **you may opt out of Information Sharing.** That is, you may direct the company in the National General Insurance Group not to share information (other than as permitted by law). Information Sharing permitted by law includes, for example, sharing with companies that work for a company in the National General Insurance Group to provide the product or services you request and sharing with affiliates information about our transactions or experiences with you for everyday business purposes.
- Your Information Sharing opt out direction will apply to nonpublic personal information, as described above, that the company in the National General Insurance Group has collected about you and your existing accounts.

## Affiliate Marketing
- Federal law gives you the right to limit some but not all marketing from the companies in the National General Insurance Group and their affiliates. You may limit companies in the National General Insurance Group and their affiliates from marketing their products or services to you **based on nonpublic personal information about you that they receive from a company in the National General Insurance Group.** This information includes income, account information, credit history, and payment history.
- Your choice to limit Affiliate Marketing will apply to nonpublic information about you and your existing account.

## How to Opt Out of Information Sharing or Limit Affiliate Marketing:
- If you wish to opt out of Information Sharing with affiliates, or with non-affiliated third parties, or with both, or to limit Affiliate Marketing, other than as permitted by law, please complete the form below and return it to the following address:

  INTEGON NATIONAL INSURANCE COMPANY
  P.O. BOX 961291
  FORT WORTH, TX 76161

- Each time you establish a new account with a company in the National General Insurance Group, you will receive a privacy notice and an opportunity to opt out of Information Sharing and limit Affiliate Marketing for that account, as permitted by law.
- If you have a joint account with another person, either of you may opt out of Information Sharing or limit Affiliate Marketing (other than as permitted by law) for both of you.

66H01-00PN0008-R1117

*Reference to the National General Insurance Group in this notice includes the following companies:  National General Insurance Company, National General Assurance Company, National General Insurance Online, Inc., Integon Casualty Insurance Company, Integon General Insurance Corporation, Integon Indemnity Corporation, Integon National Insurance Company, Integon Preferred Insurance Company, New South Insurance Company,  MIC General Insurance Corporation,  Home State County Mutual Insurance Company - (Administered by Integon National Insurance Company,   National General Insurance Company, Imperial Fire & Casualty Insurance Company or Integon Indemnity Corporation), National General  Motor Club, Inc., National Health Insurance Company, Agent Alliance Insurance Company, National General Premier Insurance Company, Imperial Fire & Casualty Insurance Company, Adirondack Insurance Exchange, Mountain Valley Indemnity Company, New Jersey Skylands Insurance Association, New Jersey Skylands Insurance Company, Century-National Insurance Company, Standard Property and Casualty Insurance Company, Direct Insurance Company, Direct General Insurance Company, Direct General Insurance Company of Louisiana, Direct General Insurance Company of Mississippi, Direct National Insurance Company, Direct General Life Insurance Company, and Old American County Mutual Fire Insurance Company (Administered by Direct General Insurance Agency).

**Affiliates of the National General Insurance Group include:** companies in the National General Insurance Group referenced in this notice, and companies that now or in the future control, are controlled by, or are under common control with a company in the National General Insurance Group.

-------------------------------------------------------------------------------------

I direct my information not be shared with affiliates or with non-affiliated third parties, and to limit Affiliate Marketing, other than as permitted by law.

**Jeffrey G Meyer Anne G Meyer**                   **G-5000679**

Named Insured                                      Account (Policy) Number

9441 OLD A1A
ST AUGUSTINE FL  32080                             **9046-877958607**

Property Address                                   Loan Number

Signature                                          Date

66H01-00PN0008-R1117



CERTIFIED MAIL®

7014 2120 0001 4967 9494

Joseph W. Jensen, III
130 South Olive Ave
Ste 304
West Palm Beach, FL 334

Received 8/26/19
~JbS

National General Insurance
4455 LBJ Freeway Suite 500
Dallas, TX
75234

# EXHIBIT "C"

 **Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

|             |                            |
|-------------|----------------------------|
| Insured:    | Jeffrey & Anne Meyer       |
| Property:   | 9441 Old Hwy. A1A          |
|             | St. Augustine, FL          |

| | | | |
|-----------|------------------------------|-----------|-------------------|
| Estimator:| Allen K. Bates               | Business: | (352) 514-5055    |
| Company:  | Golden Group Consultants, LLC| E-mail:   | Padjuster1@aol.com|
| Business: | P.O. Box 494                 |           |                   |
|           | Alachua, FL 32616            |           |                   |

**Claim Number:**                **Policy Number:**                 **Type of Loss:** <NONE>

| | | | |
|----------------|-----------------------|----------------|----------------------|
| Date of Loss:  | 10/8/2016 12:00 AM    | Date Received: | 12/15/2020 12:00 AM  |
| Date Inspected:| 12/18/2020 12:00 AM   | Date Entered:  | 12/21/2020 11:27 AM  |

| | |
|-----------|----------------------------|
| Price List:| FLJA8X_DEC20              |
|           | Restoration/Service/Remodel|
| Estimate: | MEYER-J&A-RCV-FLOOD        |



**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

**MEYER-J&A-RCV-FLOOD**

**Main Level**



**Entry Hallway**                                                            **Height: 8'**

298.67 SF Walls                              80.68 SF Ceiling
379.34 SF Walls & Ceiling                    80.68 SF Floor
8.96 SY Flooring                             37.33 LF Floor Perimeter
37.33 LF Ceil. Perimeter

**Missing Wall**            4' 6" X 8'                    Opens into FAMILY_ROOM
**Missing Wall**            3' 2" X 8'                    Opens into STAIRS



**Subroom:  Coat Closet (1)**                                            **Height: 8'**

106.52 SF Walls                              10.27 SF Ceiling
116.79 SF Walls & Ceiling                    10.27 SF Floor
1.14 SY Flooring                             12.88 LF Floor Perimeter
12.88 LF Ceil. Perimeter

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| Muck-out/Flood loss cleanup | 90.94 SF | 3.47 | 0.00 | 0.00 | 63.12 | 378.68 |
| Dehumidifier (per 24 hour period) - No monitoring | 7.00 EA | 0.00 | 82.71 | 0.00 | 115.80 | 694.77 |
| 1 unit for 7 days. | | | | | | |
| Apply plant-based anti-microbial agent to more than the floor | 191.36 SF | 0.00 | 0.24 | 0.67 | 9.32 | 55.92 |
| Tile floor covering | 90.94 SF | 2.25 | 10.16 | 40.61 | 233.84 | 1,403.02 |
| Additional labor to remove tile from concrete slab | 90.94 SF | 1.60 | 0.00 | 0.00 | 29.10 | 174.60 |
| Floor leveling cement - Average | 90.94 SF | 0.00 | 1.84 | 6.05 | 34.68 | 208.06 |
| Add-on for diagonal tile installation | 90.94 SF | 0.00 | 0.84 | 0.00 | 15.28 | 91.67 |
| Baseboard - 5 1/4" | 50.21 LF | 0.46 | 5.09 | 10.90 | 57.92 | 347.49 |
| Base shoe | 50.21 LF | 0.15 | 1.25 | 1.55 | 14.38 | 86.22 |
| Floor protection - heavy paper and tape | 90.94 SF | 0.00 | 0.33 | 0.38 | 6.08 | 36.47 |
| Seal & paint baseboard w/cap &/or shoe, oversized- 2 coats | 50.21 LF | 0.00 | 1.47 | 1.02 | 14.96 | 89.79 |
| Rigid foam insulation board - 1" | 100.42 SF | 0.29 | 1.37 | 4.57 | 34.26 | 205.53 |
| 1/2" drywall - hung, taped, floated, ready for paint | 100.42 SF | 0.38 | 2.33 | 3.44 | 55.12 | 330.70 |



**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

**CONTINUED - Entry Hallway**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| Texture drywall - light hand texture | 100.42 SF | 0.00 | 0.65 | 0.56 | 13.18 | 79.01 |
| Seal/prime then paint more than the floor perimeter twice (3 coats) | 100.42 SF | 0.00 | 1.03 | 2.11 | 21.10 | 126.64 |
| Exterior door - metal - insulated - flush or panel style | 1.00 EA | 19.29 | 314.88 | 16.58 | 70.16 | 420.91 |
| Prime & paint door slab only - exterior (per side) | 2.00 EA | 0.00 | 36.49 | 1.94 | 14.98 | 89.90 |
| Brick mold - paint grade softwood - finger jointed | 17.00 LF | 0.46 | 2.35 | 1.73 | 9.90 | 59.40 |
| Seal & paint brick mold - two coats | 17.00 LF | 0.00 | 1.08 | 0.13 | 3.70 | 22.19 |
| Casing - 3 1/4" MDF w/detail | 17.00 LF | 0.46 | 2.69 | 2.13 | 11.12 | 66.80 |
| Paint casing - oversized - two coats | 17.00 LF | 0.00 | 1.19 | 0.25 | 4.10 | 24.58 |
| Door lockset & deadbolt - exterior - Detach & reset | 1.00 EA | 0.00 | 28.07 | 0.00 | 5.62 | 33.69 |
| Interior door unit | 1.00 EA | 16.87 | 322.76 | 18.70 | 71.68 | 430.01 |
| Paint door slab only - 2 coats (per side) | 2.00 EA | 0.00 | 29.39 | 1.14 | 11.98 | 71.90 |
| Paint door/window trim & jamb - 2 coats (per side) | 2.00 EA | 0.00 | 24.43 | 0.67 | 9.92 | 59.45 |
| Door knob/lockset - Detach & reset | 1.00 EA | 0.00 | 20.05 | 0.00 | 4.02 | 24.07 |
| Totals:  Entry Hallway | | | | 115.13 | 935.32 | 5,611.47 |



| **Utility Rm.** | | **Height: 8'** |
|---|---|---|
| 257.00 SF Walls | | 57.99 SF Ceiling |
| 314.99 SF Walls & Ceiling | | 57.99 SF Floor |
| 6.44 SY Flooring | | 32.13 LF Floor Perimeter |
| 32.13 LF Ceil. Perimeter | | |

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| Muck-out/Flood loss cleanup | 57.99 SF | 3.47 | 0.00 | 0.00 | 40.24 | 241.47 |
| Dehumidifier (per 24 hour period) - No monitoring<br><br>1 unit for 7 days. | 7.00 EA | 0.00 | 82.71 | 0.00 | 115.80 | 694.77 |
| Apply plant-based anti-microbial agent to more than the floor | 122.24 SF | 0.00 | 0.24 | 0.43 | 5.94 | 35.71 |
| Tile floor covering | 57.99 SF | 2.25 | 10.16 | 25.90 | 149.12 | 894.68 |
| Additional labor to remove tile from concrete slab | 57.99 SF | 1.60 | 0.00 | 0.00 | 18.56 | 111.34 |



**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

**CONTINUED - Utility Rm.**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| Floor leveling cement - Average | 57.99 SF | 0.00 | 1.84 | 3.86 | 22.12 | 132.68 |
| Baseboard - 5 1/4" | 32.13 LF | 0.46 | 5.09 | 6.97 | 37.06 | 222.35 |
| Floor protection - heavy paper and tape | 57.99 SF | 0.00 | 0.33 | 0.24 | 3.86 | 23.24 |
| Paint baseboard, oversized - two coats | 32.13 LF | 0.00 | 1.18 | 0.45 | 7.68 | 46.04 |
| Rigid foam insulation board - 1" | 64.25 SF | 0.29 | 1.37 | 2.92 | 21.90 | 131.47 |
| 1/2" drywall - hung, taped, floated, ready for paint | 64.25 SF | 0.38 | 2.33 | 2.20 | 35.26 | 211.58 |
| Texture drywall - light hand texture | 64.25 SF | 0.00 | 0.65 | 0.36 | 8.44 | 50.56 |
| Seal/prime then paint more than the floor perimeter twice (3 coats) | 64.25 SF | 0.00 | 1.03 | 1.35 | 13.52 | 81.05 |
| Interior door unit | 1.00 EA | 16.87 | 322.76 | 18.70 | 71.68 | 430.01 |
| Paint door slab only - 2 coats (per side) | 2.00 EA | 0.00 | 29.39 | 1.14 | 11.98 | 71.90 |
| Paint door/window trim & jamb - 2 coats (per side) | 2.00 EA | 0.00 | 24.43 | 0.67 | 9.92 | 59.45 |
| Door knob/lockset - Detach & reset | 1.00 EA | 0.00 | 20.05 | 0.00 | 4.02 | 24.07 |
| Totals:  Utility Rm. | | | | 65.19 | 577.10 | 3,462.37 |



| **D/S Guest Bath** | | | | | | **Height: 8'** |
|---|---|---|---|---|---|---|

| 291.67 SF Walls | 69.86 SF Ceiling |
|---|---|
| 361.53 SF Walls & Ceiling | 69.86 SF Floor |
| 7.76 SY Flooring | 36.46 LF Floor Perimeter |
| 36.46 LF Ceil. Perimeter | |

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| Muck-out/Flood loss cleanup | 69.86 SF | 3.47 | 0.00 | 0.00 | 48.48 | 290.89 |
| Dehumidifier (per 24 hour period) - No monitoring | 7.00 EA | 0.00 | 82.71 | 0.00 | 115.80 | 694.77 |
| 1 unit for 7 days. | | | | | | |
| Apply plant-based anti-microbial agent to more than the floor | 142.78 SF | 0.00 | 0.24 | 0.50 | 6.96 | 41.73 |
| Tile floor covering | 69.86 SF | 2.25 | 10.16 | 31.20 | 179.64 | 1,077.81 |
| Additional labor to remove tile from concrete slab | 69.86 SF | 1.60 | 0.00 | 0.00 | 22.36 | 134.14 |
| Floor leveling cement - Average | 69.86 SF | 0.00 | 1.84 | 4.65 | 26.64 | 159.83 |
| Baseboard - 5 1/4" | 18.23 LF | 0.46 | 5.09 | 3.96 | 21.04 | 126.18 |



**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

**CONTINUED - D/S Guest Bath**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| Base shoe | 18.23 LF | 0.15 | 1.25 | 0.56 | 5.22 | 31.30 |
| Floor protection - heavy paper and tape | 69.86 SF | 0.00 | 0.33 | 0.29 | 4.68 | 28.02 |
| Seal & paint baseboard w/cap &/or shoe, oversized- 2 coats | 18.23 LF | 0.00 | 1.47 | 0.37 | 5.44 | 32.61 |
| Rigid foam insulation board - 1" | 32.00 SF | 0.29 | 1.37 | 1.46 | 10.92 | 65.50 |
| 1/2" drywall - hung, taped, floated, ready for paint | 72.92 SF | 0.38 | 2.33 | 2.50 | 40.02 | 240.13 |
| Texture drywall - light hand texture | 72.92 SF | 0.00 | 0.65 | 0.41 | 9.56 | 57.37 |
| Seal/prime then paint more than the floor perimeter twice (3 coats) | 72.92 SF | 0.00 | 1.03 | 1.53 | 15.32 | 91.96 |
| Vanity | 8.00 LF | 6.76 | 387.37 | 197.12 | 670.04 | 4,020.20 |
| Countertop - Granite or Marble | 16.00 SF | 4.85 | 101.81 | 78.40 | 357.00 | 2,141.96 |
| Highly unlikely the granite tops will be able to be salvaged. | | | | | | |
| Backsplash - solid surface | 10.00 LF | 0.00 | 57.14 | 10.49 | 116.38 | 698.27 |
| Glued to drywall.  Existing back-splash will not match new tops. | | | | | | |
| Sink - undermount - Detach & reset | 2.00 EA | 0.00 | 247.80 | 0.19 | 99.16 | 594.95 |
| P-trap assembly - ABS (plastic) | 2.00 EA | 6.75 | 60.26 | 0.85 | 26.98 | 161.85 |
| Angle stop valve | 5.00 EA | 4.50 | 34.31 | 2.52 | 39.32 | 235.89 |
| Toilet - Detach & reset | 1.00 EA | 0.00 | 243.64 | 0.44 | 48.80 | 292.88 |
| Tile shower - 61 to 100 SF | 1.00 EA | 151.68 | 1,646.15 | 57.62 | 371.10 | 2,226.55 |
| 1/2" Cement board | 96.00 SF | 0.74 | 3.11 | 9.68 | 75.86 | 455.14 |
| Tub/shower faucet - Detach & reset | 1.00 EA | 0.00 | 208.22 | 0.00 | 41.64 | 249.86 |
| Shower door system - Detach & reset | 1.00 EA | 0.00 | 156.60 | 0.00 | 31.32 | 187.92 |
| Interior door unit | 1.00 EA | 16.87 | 322.76 | 18.70 | 71.68 | 430.01 |
| Paint door slab only - 2 coats (per side) | 2.00 EA | 0.00 | 29.39 | 1.14 | 11.98 | 71.90 |
| Casing - 3 1/4" | 34.00 LF | 0.46 | 3.37 | 5.81 | 27.20 | 163.23 |
| Paint casing - oversized - two coats | 34.00 LF | 0.00 | 1.19 | 0.50 | 8.20 | 49.16 |
| Door knob/lockset - Detach & reset | 1.00 EA | 0.00 | 20.05 | 0.00 | 4.02 | 24.07 |
| Totals:  D/S Guest Bath | | | | 430.89 | 2,512.76 | 15,076.08 |



**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com



| Family Room | | | | | Height: 8' |
|---|---|---|---|---|---|
| 891.00 SF Walls | | | 662.47 SF Ceiling | | |
| 1,553.47 SF Walls & Ceiling | | | 662.47 SF Floor | | |
| 73.61 SY Flooring | | | 111.38 LF Floor Perimeter | | |
| 111.38 LF Ceil. Perimeter | | | | | |

**Missing Wall**        4' 6" X 8'        Opens into ENTRY_HALLWA

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| Muck-out/Flood loss cleanup | 662.47 SF | 3.47 | 0.00 | 0.00 | 459.76 | 2,758.53 |
| Dehumidifier (per 24 hour period) - No monitoring | 28.00 EA | 0.00 | 82.71 | 0.00 | 463.18 | 2,779.06 |
| 4 units for 7 days. | | | | | | |
| Apply plant-based anti-microbial agent to more than the floor | 885.22 SF | 0.00 | 0.24 | 3.10 | 43.12 | 258.67 |
| Tile floor covering | 662.47 SF | 2.25 | 10.16 | 295.86 | 1,703.44 | 10,220.56 |
| Additional labor to remove tile from concrete slab | 662.47 SF | 1.60 | 0.00 | 0.00 | 212.00 | 1,271.95 |
| Floor leveling cement - Average | 662.47 SF | 0.00 | 1.84 | 44.05 | 252.60 | 1,515.59 |
| Add-on for diagonal tile installation | 662.47 SF | 0.00 | 0.84 | 0.00 | 111.30 | 667.77 |
| Baseboard - 5 1/4" | 111.38 LF | 0.46 | 5.09 | 24.17 | 128.46 | 770.78 |
| Base shoe | 111.38 LF | 0.15 | 1.25 | 3.43 | 31.86 | 191.23 |
| Floor protection - heavy paper and tape | 662.47 SF | 0.00 | 0.33 | 2.78 | 44.28 | 265.68 |
| Seal & paint baseboard w/cap &/or shoe, oversized- 2 coats | 96.00 LF | 0.00 | 1.47 | 1.95 | 28.62 | 171.69 |
| Rigid foam insulation board - 1" | 222.75 SF | 0.29 | 1.37 | 10.14 | 75.98 | 455.89 |
| 1/2" drywall - hung, taped, floated, ready for paint | 222.75 SF | 0.38 | 2.33 | 7.64 | 122.26 | 733.56 |
| Texture drywall - light hand texture | 222.75 SF | 0.00 | 0.65 | 1.25 | 29.22 | 175.26 |
| Seal/prime then paint more than the floor perimeter twice (3 coats) | 222.75 SF | 0.00 | 1.03 | 4.68 | 46.82 | 280.93 |
| Cabinetry - lower (base) units | 27.00 LF | 6.76 | 382.14 | 655.40 | 2,231.14 | 13,386.84 |
| Add on cost for roll out shelves | 7.00 EA | 0.00 | 81.80 | 40.08 | 122.54 | 735.22 |
| Cabinetry - full height unit | 2.50 LF | 8.11 | 406.95 | 63.38 | 220.22 | 1,321.26 |
| Toe kick - pre-finished wood - 1/2" | 29.50 LF | 1.69 | 8.85 | 8.80 | 63.96 | 383.70 |
| Cabinetry - upper (wall) units | 6.50 LF | 6.76 | 313.05 | 126.34 | 441.00 | 2,646.11 |
| Attached to Full Height Cabinets. | | | | | | |
| Add for prefinished crown molding per LF | 10.00 LF | 0.00 | 8.96 | 4.31 | 18.78 | 112.69 |
| Countertop - Granite or Marble | 54.00 SF | 4.85 | 101.81 | 264.60 | 1,204.84 | 7,229.08 |



**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

### CONTINUED - Family Room

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| Highly unlikely the granite tops will be able to be salvaged. | | | | | | |
| Backsplash - solid surface | 21.00 LF | 0.00 | 57.14 | 22.02 | 244.38 | 1,466.34 |
| Glued to drywall.  Existing back-splash will not match new tops. | | | | | | |
| Cabinet knob or pull | 32.00 EA | 1.05 | 8.04 | 7.93 | 59.76 | 358.57 |
| Cabinet panels - side, end, or back | 24.00 SF | 1.75 | 20.57 | 22.26 | 111.60 | 669.54 |
| Totals:  Family Room | | | | 1,614.17 | 8,471.12 | 50,826.50 |



**Bedroom #2**                                                                                      Height: 8'

| | |
|---|---|
| 392.00  SF Walls | 138.54  SF Ceiling |
| 530.54  SF Walls & Ceiling | 138.54  SF Floor |
| 15.39  SY Flooring | 49.00  LF Floor Perimeter |
| 49.00  LF Ceil. Perimeter | |



**Subroom:  Closet1 (2)**                                                                          Height: 8'

| | |
|---|---|
| 114.67  SF Walls | 12.00  SF Ceiling |
| 126.67  SF Walls & Ceiling | 12.00  SF Floor |
| 1.33  SY Flooring | 14.33  LF Floor Perimeter |
| 14.33  LF Ceil. Perimeter | |



**Subroom:  Closet (1)**                                                                           Height: 8'

| | |
|---|---|
| 105.22  SF Walls | 10.43  SF Ceiling |
| 115.64  SF Walls & Ceiling | 10.43  SF Floor |
| 1.16  SY Flooring | 13.15  LF Floor Perimeter |
| 13.15  LF Ceil. Perimeter | |

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| Muck-out/Flood loss cleanup | 160.97 SF | 3.47 | 0.00 | 0.00 | 111.72 | 670.29 |
| Dehumidifier (per 24 hour period) - No monitoring | 7.00 EA | 0.00 | 82.71 | 0.00 | 115.80 | 694.77 |
| 2 units for 7 days. | | | | | | |



**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

### CONTINUED - Bedroom #2

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| Apply plant-based anti-microbial agent to more than the floor | 313.94 SF | 0.00 | 0.24 | 1.10 | 15.30 | 91.75 |
| Tile floor covering | 160.97 SF | 2.25 | 10.16 | 71.89 | 413.92 | 2,483.45 |
| Additional labor to remove tile from concrete slab | 160.97 SF | 1.60 | 0.00 | 0.00 | 51.52 | 309.07 |
| Floor leveling cement - Average | 160.97 SF | 0.00 | 1.84 | 10.70 | 61.38 | 368.26 |
| Add-on for diagonal tile installation | 160.97 SF | 0.00 | 0.84 | 0.00 | 27.04 | 162.25 |
| Baseboard - 5 1/4" | 76.49 LF | 0.46 | 5.09 | 16.60 | 88.22 | 529.34 |
| Base shoe | 76.49 LF | 0.15 | 1.25 | 2.36 | 21.90 | 131.34 |
| Floor protection - heavy paper and tape | 160.97 SF | 0.00 | 0.33 | 0.68 | 10.76 | 64.56 |
| Seal & paint baseboard w/cap &/or shoe, oversized- 2 coats | 76.49 LF | 0.00 | 1.47 | 1.55 | 22.80 | 136.79 |
| Rigid foam insulation board - 1" | 26.00 SF | 0.29 | 1.37 | 1.18 | 8.86 | 53.20 |
| 1/2" drywall - hung, taped, floated, ready for paint | 152.97 SF | 0.38 | 2.33 | 5.25 | 83.96 | 503.76 |
| Texture drywall - light hand texture | 152.97 SF | 0.00 | 0.65 | 0.86 | 20.06 | 120.35 |
| Seal/prime then paint more than the floor perimeter twice (3 coats) | 152.97 SF | 0.00 | 1.03 | 3.21 | 32.16 | 192.93 |
| Bifold door set | 1.00 EA | 13.51 | 246.01 | 10.39 | 53.98 | 323.89 |
| Paint bifold door set - slab only - 2 coats (per side) | 4.00 EA | 0.00 | 40.79 | 4.46 | 33.54 | 201.16 |
| Door opening (jamb & casing) | 1.00 EA | 5.66 | 234.54 | 12.10 | 50.46 | 302.76 |
| @ Bi-fold door. | | | | | | |
| Paint door/window trim & jamb - 2 coats (per side) | 1.00 EA | 0.00 | 28.13 | 0.39 | 5.70 | 34.22 |
| Seal & paint casing - oversized - two coats | 34.00 LF | 0.00 | 1.20 | 0.40 | 8.24 | 49.44 |
| Casing - 3 1/4" MDF w/detail | 34.00 LF | 0.46 | 2.69 | 4.26 | 22.28 | 133.64 |
| Interior door unit | 2.00 EA | 16.87 | 322.76 | 37.40 | 143.32 | 859.98 |
| Paint door slab only - 2 coats (per side) | 4.00 EA | 0.00 | 29.39 | 2.28 | 23.98 | 143.82 |
| Casing - 3 1/4" | 34.00 LF | 0.46 | 3.37 | 5.81 | 27.20 | 163.23 |
| Paint casing - oversized - two coats | 34.00 LF | 0.00 | 1.19 | 0.50 | 8.20 | 49.16 |
| Paint door/window jamb - 2 coats (per side) | 4.00 EA | 0.00 | 24.43 | 1.34 | 19.80 | 118.86 |
| Door knob/lockset - Detach & reset | 2.00 EA | 0.00 | 20.05 | 0.00 | 8.02 | 48.12 |
| Totals:  Bedroom #2 | | | | 194.71 | 1,490.12 | 8,940.39 |



**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com



| Bedroom #1 | Height: 8' |
|---|---|

| | |
|---|---|
| 416.00 SF Walls | 141.41 SF Ceiling |
| 557.41 SF Walls & Ceiling | 141.41 SF Floor |
| 15.71 SY Flooring | 52.00 LF Floor Perimeter |
| 52.00 LF Ceil. Perimeter | |



| Subroom:  Closet (1) | Height: 8' |
|---|---|

| | |
|---|---|
| 182.67 SF Walls | 23.33 SF Ceiling |
| 206.00 SF Walls & Ceiling | 23.33 SF Floor |
| 2.59 SY Flooring | 22.83 LF Floor Perimeter |
| 22.83 LF Ceil. Perimeter | |

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| Muck-out/Flood loss cleanup | 164.74 SF | 3.47 | 0.00 | 0.00 | 114.34 | 685.99 |
| Dehumidifier (per 24 hour period) - No monitoring | 7.00 EA | 0.00 | 82.71 | 0.00 | 115.80 | 694.77 |
| 2 units for 7 days. | | | | | | |
| Apply plant-based anti-microbial agent to more than the floor | 314.41 SF | 0.00 | 0.24 | 1.10 | 15.32 | 91.88 |
| Tile floor covering | 164.74 SF | 2.25 | 10.16 | 73.57 | 423.62 | 2,541.62 |
| Additional labor to remove tile from concrete slab | 164.74 SF | 1.60 | 0.00 | 0.00 | 52.72 | 316.30 |
| Floor leveling cement - Average | 164.74 SF | 0.00 | 1.84 | 10.96 | 62.82 | 376.90 |
| Add-on for diagonal tile installation | 164.74 SF | 0.00 | 0.84 | 0.00 | 27.68 | 166.06 |
| Baseboard - 5 1/4" | 74.83 LF | 0.46 | 5.09 | 16.24 | 86.30 | 517.84 |
| Base shoe | 74.83 LF | 0.15 | 1.25 | 2.31 | 21.40 | 128.47 |
| Floor protection - heavy paper and tape | 164.74 SF | 0.00 | 0.33 | 0.69 | 11.02 | 66.07 |
| Seal & paint baseboard w/cap &/or shoe, oversized- 2 coats | 74.83 LF | 0.00 | 1.47 | 1.52 | 22.30 | 133.82 |
| Rigid foam insulation board - 1" | 26.00 SF | 0.29 | 1.37 | 1.18 | 8.86 | 53.20 |
| 1/2" drywall - hung, taped, floated, ready for paint | 149.67 SF | 0.38 | 2.33 | 5.13 | 82.14 | 492.87 |
| Texture drywall - light hand texture | 149.67 SF | 0.00 | 0.65 | 0.84 | 19.62 | 117.75 |
| Seal/prime then paint more than the floor perimeter twice (3 coats) | 149.67 SF | 0.00 | 1.03 | 3.14 | 31.46 | 188.76 |
| Bifold door set - Double | 1.00 EA | 13.51 | 246.01 | 10.39 | 53.98 | 323.89 |
| Paint bifold door set - slab only - 2 coats (per side) | 4.00 EA | 0.00 | 40.79 | 4.46 | 33.54 | 201.16 |



**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

**CONTINUED - Bedroom #1**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| Casing - 3 1/4" | 34.00 LF | 0.46 | 3.37 | 5.81 | 27.20 | 163.23 |
| Seal & paint casing - oversized - two coats | 34.00 LF | 0.00 | 1.20 | 0.40 | 8.24 | 49.44 |
| Casing - 3 1/4" MDF w/detail | 17.00 LF | 0.46 | 2.69 | 2.13 | 11.12 | 66.80 |
| Paint casing - oversized - two coats | 17.00 LF | 0.00 | 1.19 | 0.25 | 4.10 | 24.58 |
| Interior door unit | 1.00 EA | 16.87 | 322.76 | 18.70 | 71.68 | 430.01 |
| Paint door slab only - 2 coats (per side) | 2.00 EA | 0.00 | 29.39 | 1.14 | 11.98 | 71.90 |
| Paint door/window trim & jamb - 2 coats (per side) | 2.00 EA | 0.00 | 24.43 | 0.67 | 9.92 | 59.45 |
| Door knob/lockset - Detach & reset | 1.00 EA | 0.00 | 20.05 | 0.00 | 4.02 | 24.07 |
| Door opening (jamb & casing) - 60" or wider | 1.00 EA | 5.66 | 234.54 | 12.10 | 50.46 | 302.76 |
| @ Bi-fold door. | | | | | | |
| Paint door/window trim & jamb - Large - 2 coats (per side) | 1.00 EA | 0.00 | 28.13 | 0.39 | 5.70 | 34.22 |
| Totals:  Bedroom #1 | | | | 173.12 | 1,387.34 | 8,323.81 |



**Bath #2**  Height: 8'

277.33 SF Walls  55.77 SF Ceiling
333.10 SF Walls & Ceiling  55.77 SF Floor
6.20 SY Flooring  34.67 LF Floor Perimeter
34.67 LF Ceil. Perimeter



**Subroom:  Closet (1)**  Height: 8'

84.00 SF Walls  5.81 SF Ceiling
89.81 SF Walls & Ceiling  5.81 SF Floor
0.65 SY Flooring  10.50 LF Floor Perimeter
10.50 LF Ceil. Perimeter

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| Muck-out/Flood loss cleanup | 61.58 SF | 3.47 | 0.00 | 0.00 | 42.74 | 256.42 |
| Dehumidifier (per 24 hour period) - No monitoring | 7.00 EA | 0.00 | 82.71 | 0.00 | 115.80 | 694.77 |
| 1 unit for 7 days. | | | | | | |



**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

## CONTINUED - Bath #2

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| Apply plant-based anti-microbial agent to more than the floor | 151.91 SF | 0.00 | 0.24 | 0.53 | 7.40 | 44.39 |
| Tile floor covering | 61.58 SF | 2.25 | 10.16 | 27.50 | 158.36 | 950.07 |
| Additional labor to remove tile from concrete slab | 61.58 SF | 1.60 | 0.00 | 0.00 | 19.70 | 118.23 |
| Floor leveling cement - Average | 61.58 SF | 0.00 | 1.84 | 4.10 | 23.48 | 140.89 |
| Baseboard - 5 1/4" | 22.58 LF | 0.46 | 5.09 | 4.90 | 26.04 | 156.26 |
| Base shoe | 22.58 LF | 0.15 | 1.25 | 0.70 | 6.46 | 38.78 |
| Floor protection - heavy paper and tape | 61.58 SF | 0.00 | 0.33 | 0.26 | 4.12 | 24.70 |
| Seal & paint baseboard w/cap &/or shoe, oversized- 2 coats | 22.58 LF | 0.00 | 1.47 | 0.46 | 6.74 | 40.39 |
| Rigid foam insulation board - 1" | 32.00 SF | 0.29 | 1.37 | 1.46 | 10.92 | 65.50 |
| 1/2" drywall - hung, taped, floated, ready for paint | 90.33 SF | 0.38 | 2.33 | 3.10 | 49.58 | 297.48 |
| Texture drywall - light hand texture | 90.33 SF | 0.00 | 0.65 | 0.51 | 11.84 | 71.06 |
| Seal/prime then paint more than the floor perimeter twice (3 coats) | 90.33 SF | 0.00 | 1.03 | 1.90 | 18.98 | 113.92 |
| Vanity | 8.00 LF | 6.76 | 387.37 | 197.12 | 670.04 | 4,020.20 |
| Countertop - Granite or Marble | 16.00 SF | 4.85 | 101.81 | 78.40 | 357.00 | 2,141.96 |
| Highly unlikely the granite tops will be able to be salvaged. | | | | | | |
| Backsplash - solid surface | 10.00 LF | 0.00 | 57.14 | 10.49 | 116.38 | 698.27 |
| Glued to drywall.  Existing back-splash will not match new tops. | | | | | | |
| Sink - undermount - Detach & reset | 2.00 EA | 0.00 | 247.80 | 0.19 | 99.16 | 594.95 |
| P-trap assembly - ABS (plastic) | 2.00 EA | 6.75 | 60.26 | 0.85 | 26.98 | 161.85 |
| Angle stop valve | 5.00 EA | 4.50 | 34.31 | 2.52 | 39.32 | 235.89 |
| Toilet - Detach & reset | 1.00 EA | 0.00 | 243.64 | 0.44 | 48.80 | 292.88 |
| Bathtub | 1.00 EA | 67.51 | 851.72 | 28.34 | 189.50 | 1,137.07 |
| Tile tub surround - up to 60 SF | 1.00 EA | 107.84 | 1,202.81 | 38.74 | 269.86 | 1,619.25 |
| 1/2" Cement board | 60.00 SF | 0.74 | 3.11 | 6.05 | 47.42 | 284.47 |
| Tub/shower faucet - Detach & reset | 1.00 EA | 0.00 | 208.22 | 0.00 | 41.64 | 249.86 |
| Interior door unit | 2.00 EA | 16.87 | 322.76 | 37.40 | 143.32 | 859.98 |
| Paint door slab only - 2 coats (per side) | 4.00 EA | 0.00 | 29.39 | 2.28 | 23.98 | 143.82 |
| Casing - 3 1/4" | 68.00 LF | 0.46 | 3.37 | 11.61 | 54.42 | 326.47 |
| Paint casing - oversized - two coats | 68.00 LF | 0.00 | 1.19 | 1.00 | 16.38 | 98.30 |
| Door knob/lockset - Detach & reset | 2.00 EA | 0.00 | 20.05 | 0.00 | 8.02 | 48.12 |
| Totals:  Bath #2 | | | | 460.85 | 2,654.38 | 15,926.20 |

MEYER-J&A-RCV-FLOOD



**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com



| Stairs | | Height: 17' |
|---|---|---|
| 209.57 SF Walls | | 22.50 SF Ceiling |
| 232.07 SF Walls & Ceiling | | 37.54 SF Floor |
| 4.17 SY Flooring | | 16.17 LF Floor Perimeter |
| 14.21 LF Ceil. Perimeter | | |

**Missing Wall**          3' 2" X 17'          Opens into ENTRY_HALLWA



| Subroom:  Stairs2 (1) | | Height: 12' 6" |
|---|---|---|
| 145.64 SF Walls | | 25.01 SF Ceiling |
| 170.65 SF Walls & Ceiling | | 41.74 SF Floor |
| 4.64 SY Flooring | | 16.17 LF Floor Perimeter |
| 14.21 LF Ceil. Perimeter | | |

**Missing Wall**          3' 6 1/4" X 12' 6"          Opens into LANDING



| Subroom:  Landing (2) | | Height: 12' 6" |
|---|---|---|
| 187.24 SF Walls | | 27.94 SF Ceiling |
| 215.18 SF Walls & Ceiling | | 27.94 SF Floor |
| 3.10 SY Flooring | | 14.98 LF Floor Perimeter |
| 14.98 LF Ceil. Perimeter | | |

**Missing Wall**          3' 6 1/4" X 12' 6"          Opens into STAIRS2
**Missing Wall**          3' 2" X 12' 6"          Opens into STAIRS

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| Muck-out/Flood loss cleanup | 26.80 SF | 3.47 | 0.00 | 0.00 | 18.60 | 111.60 |
| Dehumidifier (per 24 hour period) - No monitoring | 7.00 EA | 0.00 | 82.71 | 0.00 | 115.80 | 694.77 |
| 1 unit for 7 days. | | | | | | |
| Apply plant-based anti-microbial agent to more than the floor | 201.84 SF | 0.00 | 0.24 | 0.71 | 9.82 | 58.97 |
| Tile floor covering | 107.21 SF | 2.25 | 10.16 | 47.88 | 275.68 | 1,654.03 |
| Treads only.  Line of sight match to Family Room. | | | | | | |
| Baseboard - 5 1/4" | 24.00 LF | 0.46 | 5.09 | 5.21 | 27.68 | 166.09 |
| Floor protection - heavy paper and tape | 107.21 SF | 0.00 | 0.33 | 0.45 | 7.18 | 43.01 |
| Paint baseboard, oversized - two coats | 47.31 LF | 0.00 | 1.18 | 0.66 | 11.30 | 67.79 |



**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

## CONTINUED - Stairs

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 1/2" drywall - hung, taped, floated, ready for paint | 94.63 SF | 0.38 | 2.33 | 3.25 | 51.96 | 311.66 |
| Texture drywall - light hand texture | 94.63 SF | 0.00 | 0.65 | 0.53 | 12.40 | 74.44 |
| Seal/prime then paint more than the floor perimeter twice (3 coats) | 94.63 SF | 0.00 | 1.03 | 1.99 | 19.90 | 119.36 |
| Totals:  Stairs | | | | 60.68 | 550.32 | 3,301.72 |



**Utility Closet**                                                      **Height: Sloped**

388.13 SF Walls                     69.16 SF Ceiling
457.29 SF Walls & Ceiling           66.24 SF Floor
7.36 SY Flooring                    36.67 LF Floor Perimeter
41.84 LF Ceil. Perimeter

| **Missing Wall - Goes to Floor** | **4' X 6' 8"** | | | **Opens into Exterior** | | |
|---|---|---|---|---|---|---|
| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
| Muck-out/Flood loss cleanup | 66.24 SF | 3.47 | 0.00 | 0.00 | 45.98 | 275.83 |
| Dehumidifier (per 24 hour period) - No monitoring | 7.00 EA | 0.00 | 82.71 | 0.00 | 115.80 | 694.77 |
| 1 unit for 7 days. | | | | | | |
| Apply plant-based anti-microbial agent to more than the floor | 139.58 SF | 0.00 | 0.24 | 0.49 | 6.80 | 40.79 |
| Rigid foam insulation board - 1" | 73.33 SF | 0.29 | 1.37 | 3.34 | 25.02 | 150.09 |
| 1/2" drywall - hung, taped, floated, ready for paint | 73.33 SF | 0.38 | 2.33 | 2.52 | 40.26 | 241.51 |
| Texture drywall - light hand texture | 73.33 SF | 0.00 | 0.65 | 0.41 | 9.62 | 57.69 |
| Seal/prime then paint more than the floor perimeter twice (3 coats) | 73.33 SF | 0.00 | 1.03 | 1.54 | 15.40 | 92.47 |
| Water heater - 40 gallon - Electric | 1.00 EA | 52.04 | 983.99 | 42.76 | 215.76 | 1,294.55 |
| Pressurized water tank - 40 gallons | 1.00 EA | 52.04 | 698.78 | 22.80 | 154.72 | 928.34 |
| Totals:  Utility Closet | | | | 73.86 | 629.36 | 3,776.04 |



**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com



| Storage | | | | | Height: Sloped |
|---|---|---|---|---|---|

113.89  SF Walls
130.28  SF Walls & Ceiling
1.20  SY Flooring
16.80  LF Ceil. Perimeter

16.39  SF Ceiling
10.79  SF Floor
10.50  LF Floor Perimeter

**Missing Wall - Goes to Floor**   2' 8" X 6' 8"     **Opens into Exterior**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| Muck-out/Flood loss cleanup | 10.79 SF | 3.47 | 0.00 | 0.00 | 7.48 | 44.92 |
| Dehumidifier (per 24 hour period) - No monitoring | 7.00 EA | 0.00 | 82.71 | 0.00 | 115.80 | 694.77 |
| 1 unit for 7 days. | | | | | | |
| Apply plant-based anti-microbial agent to more than the floor | 31.79 SF | 0.00 | 0.24 | 0.11 | 1.54 | 9.28 |
| Tile floor covering | 10.79 SF | 2.25 | 10.16 | 4.82 | 27.74 | 166.47 |
| Additional labor to remove tile from concrete slab | 10.79 SF | 1.60 | 0.00 | 0.00 | 3.46 | 20.72 |
| Floor leveling cement - Average | 10.79 SF | 0.00 | 1.84 | 0.72 | 4.12 | 24.69 |
| Baseboard - 5 1/4" | 10.50 LF | 0.46 | 5.09 | 2.28 | 12.12 | 72.68 |
| Floor protection - heavy paper and tape | 10.79 SF | 0.00 | 0.33 | 0.05 | 0.74 | 4.35 |
| Paint baseboard, oversized - two coats | 10.50 LF | 0.00 | 1.18 | 0.15 | 2.52 | 15.06 |
| Rigid foam insulation board - 1" | 21.00 SF | 0.29 | 1.37 | 0.96 | 7.18 | 43.00 |
| 1/2" drywall - hung, taped, floated, ready for paint | 21.00 SF | 0.38 | 2.33 | 0.72 | 11.52 | 69.15 |
| Texture drywall - light hand texture | 21.00 SF | 0.00 | 0.65 | 0.12 | 2.76 | 16.53 |
| Seal/prime then paint more than the floor perimeter twice (3 coats) | 21.00 SF | 0.00 | 1.03 | 0.44 | 4.40 | 26.47 |
| Totals:  Storage | | | | 10.37 | 201.38 | 1,208.09 |
| Total: Main Level | | | | **3,198.97** | **19,409.20** | **116,452.67** |

| Coverage B | | | | | | |
|---|---|---|---|---|---|---|
| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
| Picket fence, 3' to 4' high | 240.00 LF | 5.62 | 19.24 | 212.18 | 1,235.72 | 7,414.30 |
| Totals:  Coverage B | | | | 212.18 | 1,235.72 | 7,414.30 |



**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

### Exterior & General Conditions

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| **General Conditions:** | | | | | | |
| Taxes, insurance, permits & fees (Estimated @ 1.5%) | 1.00 EA | 0.00 | 3,000.00 | 0.00 | 600.00 | 3,600.00 |
| Permits needed on several trades involved doing repairs.  Incl. Notice Of Commencement (as required by statute), inspections, and issuance of Certificate Of Occupancy. | | | | | | |
| Water Extraction & Remediation (Verify with Insured) | 1.00 EA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Temporary Repairs (Verify with Insured) | 1.00 EA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Clean with pressure/chemical spray - Heavy | 1.00 EA | 0.00 | 300.00 | 0.00 | 60.00 | 360.00 |
| Exterior outlet or switch | 1.00 EA | 4.53 | 23.69 | 0.62 | 5.76 | 34.60 |
| Electrician - per hour | 12.00 HR | 0.00 | 116.00 | 0.00 | 278.40 | 1,670.40 |
| Due to the complexity of these repairs, it will be necessary to have a licensed electrical contractor inspect and verify operation of all electrical components.  This will include a megometer check. | | | | | | |
| Security system - contact w/wire (per opening)- High grade | 1.00 EA | 2.54 | 118.11 | 1.05 | 24.34 | 146.04 |
| Central air - condenser unit - 2 ton | 3.00 EA | 37.61 | 2,653.26 | 487.12 | 1,711.94 | 10,271.67 |
| Safety switch (disconnect) - 30 amp 240v 3P type 1 | 3.00 EA | 177.55 | 441.52 | 29.65 | 377.40 | 2,264.26 |
| @ new compressors. | | | | | | |
| HVAC Technician - per hour | 8.00 HR | 0.00 | 100.10 | 0.00 | 160.16 | 960.96 |
| Start up and balance 3 systems. | | | | | | |
| Temporary power usage (per month) | 2.00 MO | 0.00 | 135.69 | 19.00 | 58.08 | 348.46 |
| Temporary power - hookup | 1.00 EA | 64.05 | 313.38 | 0.00 | 75.50 | 452.93 |
| Temporary toilet (per month) | 2.00 MO | 0.00 | 112.69 | 0.00 | 45.08 | 270.46 |
| Dumpster load - Approx. 20 yards, 4 tons of debris | 2.00 EA | 495.00 | 0.00 | 0.00 | 198.00 | 1,188.00 |
| Sandblasting | 300.00 SF | 0.00 | 1.50 | 2.73 | 90.54 | 543.27 |
| Lower 3 feet of home only. | | | | | | |
| Stucco color coat (Redash) - coarse texture | 300.00 SF | 0.00 | 3.58 | 10.92 | 216.98 | 1,301.90 |
| Lower 3 feet of home only. | | | | | | |
| Content Manipulation charge - per hour | 60.00 HR | 0.00 | 36.50 | 0.00 | 438.00 | 2,628.00 |
| Includes pack out (including all materials such as boxes, tape, labels, etc.), as well as labor to transport to off site air conditioned storage facility for 2 months, return property to premises and re-set ion place. | | | | | | |
| Final cleaning - construction - Residential | 1.00 EA | 0.00 | 300.00 | 0.00 | 60.00 | 360.00 |
| Flood damaged areas only (lower level). | | | | | | |



**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

### CONTINUED - Exterior & General Conditions

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| Totals: Exterior & General Conditions | | | | 551.09 | 4,400.18 | 26,400.95 |

**Labor Minimums Applied**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| Door labor minimum | 1.00 EA | 0.00 | 85.58 | 0.00 | 17.12 | 102.70 |
| Totals: Labor Minimums Applied | | | | 0.00 | 17.12 | 102.70 |
| **Line Item Totals: MEYER-J&A-RCV-FLOOD** | | | | **3,962.24** | **25,062.22** | **150,370.62** |

## Grand Total Areas:

| | | | | | |
|---|---|---|---|---|---|
| 9,910.94 | SF Walls | 3,882.59 | SF Ceiling | 13,793.53 | SF Walls and Ceiling |
| 3,905.62 | SF Floor | 433.96 | SY Flooring | 1,202.35 | LF Floor Perimeter |
| 0.00 | SF Long Wall | 0.00 | SF Short Wall | 1,209.90 | LF Ceil. Perimeter |
| 3,905.62 | Floor Area | 4,161.42 | Total Area | 9,611.47 | Interior Wall Area |
| 4,523.75 | Exterior Wall Area | 493.31 | Exterior Perimeter of Walls | | |
| 0.00 | Surface Area | 0.00 | Number of Squares | 0.00 | Total Perimeter Length |
| 0.00 | Total Ridge Length | 0.00 | Total Hip Length | | |

| Coverage | Item Total | % | ACV Total | % |
|---|---|---|---|---|
| Dwelling | 142,956.32 | 95.07% | 142,956.32 | 95.07% |
| Other Structures | 7,414.30 | 4.93% | 7,414.30 | 4.93% |
| Contents | 0.00 | 0.00% | 0.00 | 0.00% |
| Total | 150,370.62 | 100.00% | 150,370.62 | 100.00% |



**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

### Summary for Dwelling

| | |
|---|---:|
| Line Item Total | 115,379.76 |
| Material Sales Tax | 3,750.06 |
| | |
| Subtotal | 119,129.82 |
| Overhead | 11,913.25 |
| Profit | 11,913.25 |
| | |
| **Replacement Cost Value** | **$142,956.32** |
| **Net Claim** | **$142,956.32** |

_____

Allen K. Bates



**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

## Summary for Other Structures

| | |
|---|---:|
| Line Item Total | 5,966.40 |
| Material Sales Tax | 212.18 |
| | |
| Subtotal | 6,178.58 |
| Overhead | 617.86 |
| Profit | 617.86 |
| | |
| **Replacement Cost Value** | **$7,414.30** |
| **Net Claim** | **$7,414.30** |

_____

Allen K. Bates



**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

### Recap of Taxes, Overhead and Profit

|  | Overhead (10%) | Profit (10%) | Material Sales Tax (7%) | Laundering Tax (2%) | Manuf. Home Tax (6%) | Storage Rental Tax (7%) |
|---|---|---|---|---|---|---|
| **Line Items** |  |  |  |  |  |  |
|  | 12,531.11 | 12,531.11 | 3,962.24 | 0.00 | 0.00 | 0.00 |
| **Total** |  |  |  |  |  |  |
|  | **12,531.11** | **12,531.11** | **3,962.24** | **0.00** | **0.00** | **0.00** |



**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL 32616
352-514-5055 - Mobile
Padjuster1@aol.com

## Recap by Room

**Estimate: MEYER-J&A-RCV-FLOOD**

**Area: Main Level**

| | | | | |
|---|---|---|---|---|
| **Entry Hallway** | | | **4,561.02** | **3.76%** |
| Coverage: Dwelling | 100.00% | = | 4,561.02 | |
| **Utility Rm.** | | | **2,820.08** | **2.32%** |
| Coverage: Dwelling | 100.00% | = | 2,820.08 | |
| **D/S Guest Bath** | | | **12,132.43** | **10.00%** |
| Coverage: Dwelling | 100.00% | = | 12,132.43 | |
| **Family Room** | | | **40,741.21** | **33.57%** |
| Coverage: Dwelling | 100.00% | = | 40,741.21 | |
| **Bedroom #2** | | | **7,255.56** | **5.98%** |
| Coverage: Dwelling | 100.00% | = | 7,255.56 | |
| **Bedroom #1** | | | **6,763.35** | **5.57%** |
| Coverage: Dwelling | 100.00% | = | 6,763.35 | |
| **Bath #2** | | | **12,810.97** | **10.56%** |
| Coverage: Dwelling | 100.00% | = | 12,810.97 | |
| **Stairs** | | | **2,690.72** | **2.22%** |
| Coverage: Dwelling | 100.00% | = | 2,690.72 | |
| **Utility Closet** | | | **3,072.82** | **2.53%** |
| Coverage: Dwelling | 100.00% | = | 3,072.82 | |
| **Storage** | | | **996.34** | **0.82%** |
| Coverage: Dwelling | 100.00% | = | 996.34 | |
| **Area Subtotal:  Main Level** | | | **93,844.50** | **77.34%** |
| Coverage: Dwelling | 100.00% | = | 93,844.50 | |
| **Coverage B** | | | **5,966.40** | **4.92%** |
| Coverage: Other Structures | 100.00% | = | 5,966.40 | |
| **Exterior & General Conditions** | | | **21,449.68** | **17.68%** |
| Coverage: Dwelling | 100.00% | = | 21,449.68 | |
| **Labor Minimums Applied** | | | **85.58** | **0.07%** |
| Coverage: Dwelling | 100.00% | = | 85.58 | |
| **Subtotal of Areas** | | | **121,346.16** | **100.00%** |
| Coverage: Dwelling | 95.08% | = | 115,379.76 | |
| Coverage: Other Structures | 4.92% | = | 5,966.40 | |
| **Total** | | | **121,346.16** | **100.00%** |



**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

## Recap by Category

| O&P Items | | | | Total | % |
|---|---|---|---|---:|---:|
| **CABINETRY** | | | | **32,340.55** | **21.51%** |
| Coverage: Dwelling | @ | 100.00% = | | 32,340.55 | |
| **CLEANING** | | | | **1,050.00** | **0.70%** |
| Coverage: Dwelling | @ | 100.00% = | | 1,050.00 | |
| **CONTENT MANIPULATION** | | | | **2,190.00** | **1.46%** |
| Coverage: Dwelling | @ | 100.00% = | | 2,190.00 | |
| **GENERAL DEMOLITION** | | | | **15,626.00** | **10.39%** |
| Coverage: Dwelling | @ | 91.37% = | | 14,277.20 | |
| Coverage: Other Structures | @ | 8.63% = | | 1,348.80 | |
| **DOORS** | | | | **3,474.56** | **2.31%** |
| Coverage: Dwelling | @ | 100.00% = | | 3,474.56 | |
| **DRYWALL** | | | | **3,105.96** | **2.07%** |
| Coverage: Dwelling | @ | 100.00% = | | 3,105.96 | |
| **ELECTRICAL** | | | | **2,858.36** | **1.90%** |
| Coverage: Dwelling | @ | 100.00% = | | 2,858.36 | |
| **FLOOR COVERING - CERAMIC TILE** | | | | **17,832.94** | **11.86%** |
| Coverage: Dwelling | @ | 100.00% = | | 17,832.94 | |
| **PERMITS AND FEES** | | | | **3,000.00** | **2.00%** |
| Coverage: Dwelling | @ | 100.00% = | | 3,000.00 | |
| **FENCING** | | | | **4,617.60** | **3.07%** |
| Coverage: Other Structures | @ | 100.00% = | | 4,617.60 | |
| **FINISH CARPENTRY / TRIMWORK** | | | | **3,846.58** | **2.56%** |
| Coverage: Dwelling | @ | 100.00% = | | 3,846.58 | |
| **FINISH HARDWARE** | | | | **188.47** | **0.13%** |
| Coverage: Dwelling | @ | 100.00% = | | 188.47 | |
| **HEAT,  VENT & AIR CONDITIONING** | | | | **8,760.58** | **5.83%** |
| Coverage: Dwelling | @ | 100.00% = | | 8,760.58 | |
| **INSULATION** | | | | **818.92** | **0.54%** |
| Coverage: Dwelling | @ | 100.00% = | | 818.92 | |
| **MIRRORS & SHOWER DOORS** | | | | **156.60** | **0.10%** |
| Coverage: Dwelling | @ | 100.00% = | | 156.60 | |
| **PLUMBING** | | | | **5,013.55** | **3.33%** |
| Coverage: Dwelling | @ | 100.00% = | | 5,013.55 | |
| **PAINTING** | | | | **3,606.95** | **2.40%** |
| Coverage: Dwelling | @ | 100.00% = | | 3,606.95 | |
| **STUCCO & EXTERIOR PLASTER** | | | | **1,074.00** | **0.71%** |
| Coverage: Dwelling | @ | 100.00% = | | 1,074.00 | |
| **TILE** | | | | **2,848.96** | **1.89%** |
| Coverage: Dwelling | @ | 100.00% = | | 2,848.96 | |
| **TEMPORARY REPAIRS** | | | | **810.14** | **0.54%** |
| Coverage: Dwelling | @ | 100.00% = | | 810.14 | |



**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

| O&P Items | | | Total | % |
|---|---|---|---|---|
| **WATER EXTRACTION & REMEDIATION** | | | **8,125.44** | **5.40%** |
| Coverage: Dwelling | @ | 100.00% = | 8,125.44 | |
| **O&P Items Subtotal** | | | **121,346.16** | **80.70%** |
| **Material Sales Tax** | | | **3,962.24** | **2.63%** |
| Coverage: Dwelling | @ | 94.64% = | 3,750.06 | |
| Coverage: Other Structures | @ | 5.36% = | 212.18 | |
| **Overhead** | | | **12,531.11** | **8.33%** |
| Coverage: Dwelling | @ | 95.07% = | 11,913.25 | |
| Coverage: Other Structures | @ | 4.93% = | 617.86 | |
| **Profit** | | | **12,531.11** | **8.33%** |
| Coverage: Dwelling | @ | 95.07% = | 11,913.25 | |
| Coverage: Other Structures | @ | 4.93% = | 617.86 | |
| **Total** | | | **150,370.62** | **100.00%** |



**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

1    1-Exterior
Date Taken: 12/18/2020
Taken By: AKB

Front of risk.



2    2-Exterior
Date Taken: 12/18/2020
Taken By: AKB

Front - temporary stucco repair.
Debris impact.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

3   3-Exterior
Date Taken: 12/18/2020
Taken By: AKB

Front - Impact damage on front,
support column.



4   4-Exterior
Date Taken: 12/18/2020
Taken By: AKB

Front - Stucco cracks.  Typical all
around home.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

5    5-Exterior
Date Taken: 12/18/2020
Taken By: AKB

Stucco cracks.



6    6-Exterior
Date Taken: 12/18/2020
Taken By: AKB

Stucco cracks.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

7   7-Exterior

Date Taken: 12/18/2020

Taken By: AKB

Right, front corner of home.  Damage on corner.  Outside shower.



8   8-Exterior

Date Taken: 12/18/2020

Taken By: AKB

Rigfht side of home.  Electrical meter.  Canvas awning missing.  2 Exterior lights.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

9    9-Exterior
     Date Taken: 12/18/2020
     Taken By: AKB

     Right side of home.



10    10-Exterior
      Date Taken: 12/18/2020
      Taken By: AKB

      Right, rear corner of home.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

11   12-Exterior
Date Taken: 12/18/2020
Taken By: AKB

Rear of home.  3 AC units.



12   13-Exterior
Date Taken: 12/18/2020
Taken By: AKB

Rear.  Windows that were replaced
still onsite.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

13   14-Exterior
Date Taken: 12/18/2020
Taken By: AKB

Original windows.  Damaged frames
(warped), as well as debris inside -
seals also broken.



14   15-Exterior
Date Taken: 12/18/2020
Taken By: AKB

Damaged windows.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

15  16-Exterior
Date Taken: 12/18/2020
Taken By: AKB

Damaged windows.



16  17-Exterior
Date Taken: 12/18/2020
Taken By: AKB

Water storage tank.  Rear of home.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

17   18-Exterior
Date Taken: 12/18/2020
Taken By: AKB

Left, rear corner - looking towards
2nd. and third story.



18   19-Exterior
Date Taken: 12/18/2020
Taken By: AKB

Left, rear corner.  Looking towards
Atlantic Ocean.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

19   20-Exterior
Date Taken: 12/18/2020
Taken By: AKB

Stucco cracks.



20   21-Exterior
Date Taken: 12/18/2020
Taken By: AKB

Cracks in stucco.  Separation of 2nd
floor slab and support column.
Lifting.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

21   23-Exterior
Date Taken: 12/18/2020
Taken By: AKB

Viwe into First floor living area from
Main entry door.



22   24-Interior
Date Taken: 12/18/2020
Taken By: AKB

Main Entry Foyer.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

23  25-Interior
Date Taken: 12/18/2020
Taken By: AKB

View from Main Entry - looking
towards outside.  Alarm key pad.
Recessed can.



24  26-Interior
Date Taken: 12/18/2020
Taken By: AKB

Utility / Storage Room.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

25   27-Inbterior
Date Taken: 12/18/2020
Taken By: AKB

Utility / Storage Room.



26   28-Interior
Date Taken: 12/18/2020
Taken By: AKB

Utility / Storage Room - Flor. Light
fixture.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

27   29-Interior
Date Taken: 12/18/2020
Taken By: AKB

Utility / Storage Room.  Water heater
closet under stairway.



28   30-Interior
Date Taken: 12/18/2020
Taken By: AKB

Water treatment tanks.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

29   31-Interior
Date Taken: 12/18/2020
Taken By: AKB

Small storage closet in Utility Area.



30   32-Interior
Date Taken: 12/18/2020
Taken By: AKB

Storage Closet - off Utility Area.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

31   33-Interior
Date Taken: 12/18/2020
Taken By: AKB

Looking from Entry Hallway towards
Downstairs Guest Bath.



32   34-Interior
Date Taken: 12/18/2020
Taken By: AKB

Downstairs Guest Bath.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

33    35-Interior
      Date Taken: 12/18/2020
      Taken By: AKB

      Downstairs Guest Bath.



34    36-Interior
      Date Taken: 12/18/2020
      Taken By: AKB

      Downstairs Guest Bath.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

35   37-Interior
Date Taken: 12/18/2020
Taken By: AKB

Downstairs Guest Bath.



36   38-Interior
Date Taken: 12/18/2020
Taken By: AKB

Downstairs Guest Bath.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

37    39-Interior
      Date Taken: 12/18/2020
      Taken By: AKB

      Entry Hall - Looking at Coat Closet
      and Stairs up to 2nd. Floor.



38    40-Interior
      Date Taken: 12/18/2020
      Taken By: AKB

      Entry Foyer ceiling.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

39   41-Interior
Date Taken: 12/18/2020
Taken By: AKB

Entry Hallway ceiling.  Water stains.



40   42-Interior
Date Taken: 12/18/2020
Taken By: AKB

Coat Closet.



**Golden Group Consultants, LLC**



P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

41  43-Interior
Date Taken: 12/18/2020
Taken By: AKB

Family Room.



42  44-Interior
Date Taken: 12/18/2020
Taken By: AKB

Family Room.



MEYER-J&A-RCV-FLOOD                          12/31/2020          Page: 43



**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

43   45-Interior
Date Taken: 12/18/2020
Taken By: AKB

Family Room.



44   46-Interior
Date Taken: 12/18/2020
Taken By: AKB

Family Room ceiling - water damage.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

45   47-Interior
Date Taken: 12/18/2020
Taken By: AKB

Family Room ceiling.



46   48-Interior
Date Taken: 12/18/2020
Taken By: AKB

Family Room.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

47   49-Interior
Date Taken: 12/18/2020
Taken By: AKB

Family Room ceiling.



48   50-Interior
Date Taken: 12/18/2020
Taken By: AKB

Family Room - Bar Area.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

49   51-Interior
Date Taken: 12/18/2020
Taken By: AKB

Family Room - Bar Area.



50   52-Interior
Date Taken: 12/18/2020
Taken By: AKB

Family Room - Bar Area.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

51   53-Interior
Date Taken: 12/18/2020
Taken By: AKB

Family Room - Bar Area.



52   54-Interior
Date Taken: 12/18/2020
Taken By: AKB

Looking from Family Room towards
Bedroom #2.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

53    55-Interior
Date Taken: 12/18/2020
Taken By: AKB

Bedroom #2.



54    56-Interior
Date Taken: 12/18/2020
Taken By: AKB

Bedroom #2.  Window has been
replaced.  Security system contact not
yet attached.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

55   57-Interior
Date Taken: 12/18/2020
Taken By: AKB

Bedroom #2.



56   58-Interior
Date Taken: 12/18/2020
Taken By: AKB

Bedroom #2.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

57   59-Interior
Date Taken: 12/18/2020
Taken By: AKB

Bedroom #2 ceiling.



58   60-Interior
Date Taken: 12/18/2020
Taken By: AKB

Family Room - looking towards
doorways to Bedroom #1 and Bath #2.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

59   61-Interior
Date Taken: 12/18/2020
Taken By: AKB

Bedroom #1.



60   62-Inbterior
Date Taken: 12/18/2020
Taken By: AKB

Bedroom #1.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

61   63-Interior
Date Taken: 12/18/2020
Taken By: AKB

Bedroom #1 ceiling.



62   64-Interior
Date Taken: 12/18/2020
Taken By: AKB

Bedroom #1.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

63   65-Interior
Date Taken: 12/18/2020
Taken By: AKB

Looking from Family Room into Bath
#2.



64   66-Interior
Date Taken: 12/18/2020
Taken By: AKB

Bath #2.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

65   67-Interior
Date Taken: 12/18/2020
Taken By: AKB

Bath #2.



66   68-Inbterior
Date Taken: 12/18/2020
Taken By: AKB

Bath #2 Floor tiles.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

67   69-Interior
Date Taken: 12/18/2020
Taken By: AKB

Bath #$2.  Grout cracking in tub
surround.



68   70-Interior
Date Taken: 12/18/2020
Taken By: AKB

Bath #2.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

69    71-Interior
Date Taken: 12/18/2020
Taken By: AKB

Bath #2.



70    72-Interior
Date Taken: 12/18/2020
Taken By: AKB

Bath #2 - Linen Closet.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

71    73-Interior
Date Taken: 12/18/2020
Taken By: AKB

Stairs to 2nd. Floor.



72    74-Interior
Date Taken: 12/18/2020
Taken By: AKB

Stairway to 2nd. Floor ceiling.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

73   75-Interior
Date Taken: 12/18/2020
Taken By: AKB

Landing Area @ 2nd. floor stairway.



74   76-Interior
Date Taken: 12/18/2020
Taken By: AKB

Landing Area - looking up to 2nd.
Floor.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

75   77-Interior
Date Taken: 12/18/2020
Taken By: AKB

2nd. Floor  stair ceiling.



76   78-Interior
Date Taken: 12/18/2020
Taken By: AKB

Top of landing at 2nd. Floor.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

77   79-Interior
Date Taken: 12/18/2020
Taken By: AKB

View from stair landing into Living
Room.  Bamboo flooring.



78   80-Interior
Date Taken: 12/18/2020
Taken By: AKB

Living Room.  Bamboo flooring
"cupping".  Water damaged ceilings.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

79    81-Interior
Date Taken: 12/18/2020
Taken By: AKB

Living Room.



80    82-Interior
Date Taken: 12/18/2020
Taken By: AKB

Living Room ceiling.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

81    83-Interior
Date Taken: 12/18/2020
Taken By: AKB

Living Room.



82    84-Interior
Date Taken: 12/18/2020
Taken By: AKB

Water stains on Living Room ceiling.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

83   85-Interior
Date Taken: 12/18/2020
Taken By: AKB

Living Room - looking towards
Kitchen.



84   86-Interior
Date Taken: 12/18/2020
Taken By: AKB

View from Living Room - looking
back towards stair landing.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

85   87-Interior
Date Taken: 12/18/2020
Taken By: AKB

Living Room - floor receptacle.



86   88-Interior
Date Taken: 12/18/2020
Taken By: AKB

Living Room - Bamboo flooring "cupped".





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

87   89-Interior
Date Taken: 12/18/2020
Taken By: AKB

Kitchen.



88   90-Interior
Date Taken: 12/18/2020
Taken By: AKB

Kitchen.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

89   91-Interior
Date Taken: 12/18/2020
Taken By: AKB

Kitchen.



90   92-Interior
Date Taken: 12/18/2020
Taken By: AKB

Kitchen ceiling.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

91    93-Interior
Date Taken: 12/18/2020
Taken By: AKB

Kitchen.



92    94-Interior
Date Taken: 12/18/2020
Taken By: AKB

Kitchen sink.  Granite tops w/
undermount sink.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

93   95-Interior
Date Taken: 12/18/2020
Taken By: AKB

Kitchen - looking towards Laundry
Room.



94   96-Interior
Date Taken: 12/18/2020
Taken By: AKB

Kitchen - looking into Laundry Room.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

95   97-Interior
Date Taken: 12/18/2020
Taken By: AKB

Laundry Room ceiling.  Security
system panel.



96   98-Interior
Date Taken: 12/18/2020
Taken By: AKB

Laundry Room.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

97   99-Interior
Date Taken: 12/18/2020
Taken By: AKB

Laundry Room - AH Closet



98   100-Exterior
Date Taken: 12/18/2020
Taken By: AKB

2nd. Floor Walkway.  Exiting from
Living Room.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

99   101-Exterior
Date Taken: 12/18/2020
Taken By: AKB

2nd. Floor walkway.



100  102-Exterior
Date Taken: 12/18/2020
Taken By: AKB

2nd. Floor walkway.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

101  103-Exterior
Date Taken: 12/18/2020
Taken By: AKB

2nd. Floor walkway.  Concrete deck
damage on 3rd. Floor.  Cracking
concrete.



102  104-Exterior
Date Taken: 12/18/2020
Taken By: AKB

2nd. Floor walkway.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

103  105-Exterior
Date Taken: 12/18/2020
Taken By: AKB

2nd. Floor walkway.



104  106-Exterior
Date Taken: 12/18/2020
Taken By: AKB

2nd. Floor walkway.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

105  107-Exterior
Date Taken: 12/18/2020
Taken By: AKB

2nd. Floor walkway.



106  108-Exterior
Date Taken: 12/18/2020
Taken By: AKB

2nd. Floor walkway.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

107  109-Interior
Date Taken: 12/18/2020
Taken By: AKB

Stairway to 3rd. Floor.



108  110-Interior
Date Taken: 12/18/2020
Taken By: AKB

Stairway ceiling.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

109  111-Interior
Date Taken: 12/18/2020
Taken By: AKB

Stairs to 3rd. Floor landing area.



110  112-Intyerior
Date Taken: 12/18/2020
Taken By: AKB

Stairs to 3rd. Floor.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

111  113-Interior
Date Taken: 12/18/2020
Taken By: AKB

3rd. Floor stairs ceiling.



112  114-Interior
Date Taken: 12/18/2020
Taken By: AKB

3rd. Floor landing.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

113  115-Interior
Date Taken: 12/18/2020
Taken By: AKB

3rd. Floor landing - looking into
Master Bedroom.



114  116-Interior
Date Taken: 12/18/2020
Taken By: AKB

Master Bedroom.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

115  117-Interior
Date Taken: 12/18/2020
Taken By: AKB

Master Bedroom.



116  118-Interior
Date Taken: 12/18/2020
Taken By: AKB

Master Bedroom.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

117  119-Interior
Date Taken: 12/18/2020
Taken By: AKB

Master Bedroom.



118  120-Interior
Date Taken: 12/18/2020
Taken By: AKB

Master Bedroom.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

119  121-Interior
Date Taken: 12/18/2020
Taken By: AKB

Master Bedroom.



120  122-Interior
Date Taken: 12/18/2020
Taken By: AKB

Master Bedroom - exit door to
Walkway.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

121  123-Interior
Date Taken: 12/18/2020
Taken By: AKB

Master Bedroom - looking into
Master Bath



122  124-Interior
Date Taken: 12/18/2020
Taken By: AKB

Master Bath.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

123   125-Interior
Date Taken: 12/18/2020
Taken By: AKB

Master Bath.



124   126-Interior
Date Taken: 12/18/2020
Taken By: AKB

Master Bath.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

125  127-Interior
Date Taken: 12/18/2020
Taken By: AKB

Master Bath - Jetted tub.



126  128-Interior
Date Taken: 12/18/2020
Taken By: AKB

Master Bath.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

127  129-Interior
Date Taken: 12/18/2020
Taken By: AKB

Master Bath - toilet area.



128  130-Interior
Date Taken: 12/18/2020
Taken By: AKB

Master Bath - toilet area.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

129  131-Interior
Date Taken: 12/18/2020
Taken By: AKB

Master Bath - looking into shower
area.



130  132-Interior
Date Taken: 12/18/2020
Taken By: AKB

Shower Area.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

131  133-Interior
Date Taken: 12/18/2020
Taken By: AKB

Shower Area.



132  134-Interior
Date Taken: 12/18/2020
Taken By: AKB

Shower Area.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

133  135-Interior
Date Taken: 12/18/2020
Taken By: AKB

Shower Area.



134  136-Interior
Date Taken: 12/18/2020
Taken By: AKB

Master Bath - Linen Closet.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

135  137-Inbterior
Date Taken: 12/18/2020
Taken By: AKB

Master Bath - Linen Closet.



136  138-Interior
Date Taken: 12/18/2020
Taken By: AKB

Master Bath - Walk In Closet.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

137  139-Interior
Date Taken: 12/18/2020
Taken By: AKB

Walk In Closet.



138  140-Interior
Date Taken: 12/18/2020
Taken By: AKB

Walk In Closet.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

139  141-Interior
Date Taken: 12/18/2020
Taken By: AKB

Walk In Closet.



140  142-Interior
Date Taken: 12/18/2020
Taken By: AKB

Walk In Closet.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

141  143-Interior
Date Taken: 12/18/2020
Taken By: AKB

Walk In Closet.



142  144-Interior
Date Taken: 12/18/2020
Taken By: AKB

Master Bath.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

143   145-Exterior
Date Taken: 12/18/2020
Taken By: AKB

3rd. Floor Walkway.



144   146-Exterior
Date Taken: 12/18/2020
Taken By: AKB

3rd. Floor Walkway.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

145  147-Exterior
Date Taken: 12/18/2020
Taken By: AKB

3rd. Floor Walkway.



146  148-Exterior
Date Taken: 12/18/2020
Taken By: AKB

3rd. Floor Walkway - Cracking in
concrete roof deck.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

147  149-Exterior
Date Taken: 12/18/2020
Taken By: AKB

3rd. Floor Walkway.



148  150-Exterior
Date Taken: 12/18/2020
Taken By: AKB

3rd. Floor Walkway - paint damage
on metal railing (typical).





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

149  151-Exterior
Date Taken: 12/18/2020
Taken By: AKB

3rd. Floor Walkway.  Paint damage
on railings and balusters



150  152-Exterior
Date Taken: 12/18/2020
Taken By: AKB

Paint damage.





**Golden Group Consultants, LLC**

P.O. Box 494
Alachua, FL  32616
352-514-5055 - Mobile
Padjuster1@aol.com

151  153-Exterior
Date Taken: 12/18/2020
Taken By: AKB

Paint damage.





Main Level

Main Level

Page: 99

12/31/2020

MEYER-J&A-RCV-FLOOD



2nd. Floor   Page: 100

12/31/2020



2nd. Floor

MEYER-J&A-RCV-FLOOD





3rd. Floor
Page: 101

12/31/2020

3rd. Floor

MEYER-J&A-RCV-FLOOD